IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LORENZO JOHNSON,                         :
                Petitioner              :
                            :     No.  4:04-cv-1564
      v.                              :
                            :     Judge John E. Jones III
NEAL MECHLING, *et. al*,                  :
                Respondents          :

## MEMORANDUM

March 31, 2008

This matter is before the Court on the petition of Lorenzo Johnson for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Johnson seeks relief from the life sentence imposed by the Court of Common Pleas of Dauphin County, Pennsylvania for his convictions of first degree murder and criminal conspiracy. For the reasons set forth below, the Court will deny the petition.

## I.    PROCEDURAL HISTORY

Johnson filed a pro se petition for writ of habeas corpus pursuant to § 2254 on July 19, 2004.[1]  (Doc. 1.)  Johnson filed a pro se memorandum of law in support

---

[1] Johnson initially filed a motion requesting an extension of time in which to file a § 2254 motion because the one-year statue of limitations for doing so under 28 U.S.C. § 2244(d)(1) was soon approaching, but the appeal of his second PCRA petition was still pending before the Pennsylvania Superior Court. *See* Case No. 4:04-mc-163 at Doc. 1. The Court ordered Johnson to file his petition and thereafter stayed the case pending the resolution of Johnson's state-court proceedings. *See id.* at Doc. 2.

of his petition on March 6, 2006.[2]  (Doc. 20.)  On July 24, 2006, counsel was

appointed to represent Johnson.[3]  (Doc. 25.)  With the assistance of counsel,

Johnson filed a supplemental memorandum in support of his petition on March 6,

2007.  (Doc. 33.)  Johnson also filed a motion for discovery (Doc. 34), which was

granted, subject to *in camera* review (*see* Docs. 42, 45, 50, 53).  The Respondents

filed their response to Johnson's petition on December 24, 2007.  (Doc. 64.)

Johnson filed a reply brief in support of his petition on January 23, 2008.  (Doc.

70.)  The petition is now ripe for the Court's review.[4]

## II.   BACKGROUND

On March 17, 1997, following a three-day jury trial in the Dauphin County

Court of Common Pleas, Lorenzo Johnson and co-defendant Corey Walker were

found guilty of murder in the first degree and criminal conspiracy to commit

murder.  (Notes of Trial Testimony, *Commonwealth v. Johnson, et al.*, Nos. 1544

CD 1996 and 2739 CD 1996, Docs. 66-11 to 66-24 [hereinafter N.T.] at 428-29.)

Johnson and Walker were both sentenced to mandatory life imprisonment on the

---

[2] Johnson also filed a pro se "amended" memorandum on July 27, 2006.  (Doc. 27.)

[3] The two-year delay was to allow Johnson the opportunity to pursue his second PCRA petition through the Pennsylvania courts.  *See* n.1 *supra*; *see also* Docs. 6, 11-17, 22-23.

[4] In his reply brief, Johnson requests oral argument on the petition.  The Court, however, finds that the petition may be decided based on the comprehensive submissions of the parties.

murder conviction and concurrent five to ten years of imprisonment on the conspiracy conviction. (N.T. 431-35.)

On March 27, 1997, Johnson's trial counsel filed a post-sentence motion with the trial court on the grounds that "the evidence presented at trial was insufficient to show that Lorenzo Johnson participated in the murder" and that "the verdict returned by the jury was against the weight of the evidence presented at trial, such that it tends to shock one's sense of justice." (Doc. 33-2 at 23, 24.)[5] The motion did not cite to any caselaw. Relying only on Pennsylvania law, the Court of Common Pleas denied Johnson's post-sentence motion by order of August 25, 1997. (*Id.* at 27.)

On April 30, 1998, Johnson, still represented by trial counsel, filed a direct appeal to the Pennsylvania Superior Court, again arguing that the evidence adduced at trial was insufficient as a matter of law to sustain a guilty verdict and that the verdict was against the weight of evidence. (*Id.* at 34, 41.) Johnson cited only to Pennsylvania law governing these issues. (*Id.* at 38-39, 47.) On September 28, 1998, the Superior Court affirmed Johnson's and Walker's conviction and sentence. (Doc. 64-6 at 1.) In doing so, the Superior Court applied only

---

[5] Unless otherwise noted, citations to page numbers are to the indicated pages of the ECF documents filed with this Court.

Pennsylvania law. (*Id.* at 5-8.) One judge of the court filed a separate opinion concurring with portion of the decision affirming Walker's convictions, but dissenting from the portion affirming Johnson's convictions. (*Id.* at 9-10.) This judge did not further elaborate on the reasons for his separate opinion.

Johnson filed a petition for allowance of appeal with the Pennsylvania Supreme Court, again arguing that the evidence was insufficient to support his convictions and that the verdict was against the weight of the evidence. (Doc. 64-7.) The petition cited no supporting legal authority. On February 26, 1999, the Pennsylvania Supreme Court denied the petition. (Doc. 64-8.)

On December 1, 1999, Johnson filed a pro se petition for relief under Pennsylvania's Post Conviction Relief Act ("PCRA"). (Docs. 66-2, 66-3.) After the appointment of counsel to represent Johnson, an amended PCRA petition was filed on March 21, 2000. (Doc. 64-9.) The amended petition raised several grounds for relief. Johnson argued that the failure of the Commonwealth to disclose the existence of a plea agreement with witness Victoria Doubs violated the due process guarantees of the Pennsylvania and United States Constitutions. (*Id.* at 15.) Johnson also argued that he was denied the right to counsel guaranteed by the Pennsylvania and United States Constitutions because his trial counsel provided ineffective assistance by (i) failing to object to the trial court's jury instructions and

request a standard jury instructions on inconsistent statements and witness credibility; (ii) failing to object to the hearsay testimony; (iii) failing to call Adrian Fluellen to testify; (iv) failing to call Larry Pates to testify; (v) failing to object to a certain remark in the prosecutor's closing argument; and (vi) improperly persuading Johnson not to testify.

Following an evidentiary hearing, the Court of Common Pleas denied each of Johnson's claims on the merits by order of April 29, 2002.  (Doc. 33-2 at 74.) Johnson appealed to the Superior Court, reasserting the same grounds for relief. (Doc. 66-4, 66-5.)  By order of July 17, 2003, the Superior Court affirmed the denial of Johnson's PCRA petition.  (Doc. 33-2 at 93.)  The court first found that Johnson's due process claim had not been raised on direct appeal, and therefore was not preserved for PCRA review and was waived.  The Superior Court adopted the trial court's merits analysis in rejecting Johnson's other claims.  Johnson filed a petition for allowance of appeal with the Pennsylvania Supreme Court (Doc. 66-9), which the Court denied on April 2, 2004 (Doc. 64-12).[6]

---

[6] Johnson also filed a second PCRA petition on May 20, 2002, raising a claim of after-discovered evidence.  This petition was dismissed without a hearing on May 26, 2004, and dismissal was affirmed by the Superior Court on June 15, 2006.  Johnson did not seek review in the Pennsylvania Supreme Court.  The issues raised by Johnson's second PCRA petition are not relevant to the claims raised in the current petition.

## III.   STANDARD OF REVIEW

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214

(1996), provides the standards for federal courts reviewing state court judgments

challenged by petitions for writ of habeas corpus.

Before a federal court may review the merits of a § 2254 petition, the

petitioner must demonstrate exhaustion of state court remedies and lack of

procedural default.  Section 2254(b) provides that "[a]n application for a writ of

habeas corpus on behalf of a person in custody pursuant to the judgment of a State

court shall not be granted unless it appears that the applicant has exhausted the

remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  "An

applicant shall not be deemed to have exhausted the remedies available in the

courts of the State ... if he has the right under the law of the State to raise, by any

available procedure, the question presented."  28 U.S.C. § 2254(c).  To exhaust

available state court remedies, a petitioner must "fairly present" his claim through

one complete round of the state's established appellate review process in order to

give the state courts one full opportunity to resolve any constitutional issues.[7]
*Nara v. Frank*, 488 F.3d 187, 197 (3d Cir. 2007).

If a petitioner fails to fairly present a claim to the state courts, and state procedural rules bar him from now doing so, the exhaustion requirement is satisfied because there is literally "an absence of available State corrective process" under 28 U.S.C. § 2254(b). *Whitney v. Horn,* 280 F.3d 240, 252-53 (3d Cir. 2002). In such a case, however, the petitioner has procedurally defaulted his claim, and federal courts may not consider the merits of such a claim unless the petitioner establishes "cause and prejudice" or a "fundamental miscarriage of justice" to excuse the default. *Id.* Even when a petitioner properly exhausts a claim, a federal court may not review it on the merits if a state court's decision rests on a violation of a state procedural rule that is independent of the federal question presented and adequate to support the judgment. *Id.*; *Leyva v. Williams*, 504 F.3d 357, 365-66 (3d Cir. 2007).

---

[7] On May 9, 2000, the Pennsylvania Supreme Court issued Order No. 218 which declares that federal habeas petitioners do not have to appeal to the Pennsylvania Supreme Court to satisfy the exhaustion requirement. The Third Circuit has recognized the validity of this Order, *see Lambert v. Blackwell*, 387 F.3d 210, 233-34 (3d Cir. 2004), *cert. denied*, 544 U.S. 1063 (2005), and therefore a federal petitioner under custody pursuant to the judgment of a Pennsylvania court need only appeal to the Pennsylvania Superior Court to exhaust available state remedies.

If the petitioner has exhausted available state remedies and the claims raised in the petition are not in procedural default, a federal court may reach the merits of the petition.  The federal court's review, however, is limited by the deference owed to the state courts' decisions on the merits.  Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The "contrary to" or "unreasonable application" of federal law standard of review mandated by § 2254(d)(1) requires a three-step process.  *See Outten v. Kearney*, 464 F.3d 401, 413 (3d Cir. 2006).   First, the court must identify the "clearly established Federal law, as determined by the Supreme Court of the United States" applicable to the petitioner's claims.  *Williams v. Taylor*, 529 U.S. 362, 389-91 (2000); *Outten*, 464 F.3d at 414.  "That statutory phrase refers to the

holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412.

Next, the court must determine whether the state-court decision was "contrary to" the identified federal law. *Outten*, 464 F.3d at 413. A state-court decision is contrary to federal law if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases or if the state court confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *Williams*, 529 U.S. at 405-06. A state-court decision is not "contrary to" federal law merely because the federal court considering the prisoner's habeas application might reach a different result. *Id.* at 406. To satisfy § 2254(d)(1), the state-court decision must have been "substantially different" from the relevant Supreme Court precedent. *Id.* at 405. "It is not sufficient for [the petitioner] to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, [the petitioner] must demonstrate that Supreme Court precedent requires the contrary outcome." *Outten*, 464 F.3d at 413 (citations omitted).

If the state court decision is not "contrary to" Supreme Court precedent, the court must then determine if the decision was based on an "unreasonable application of" such precedent. *Id.* at 413-14. A state-court decision involves an

"unreasonable application" of federal law if the state court identifies the correct governing legal rule from Supreme Court cases but unreasonably applies it to the facts of the particular state prisoner's case. *Williams*, 529 U.S. at 407-08. A state-court decision also involves an "unreasonable application" of federal law if it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *See id.* at 408-09; *see also Outten*, 464 F.3d at 413. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. Importantly, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law. *Id.* at 410. The court is "not authorized to grant habeas corpus relief simply because we disagree with the state court's decision or because we would have reached a different result if left to our own devices. Instead, the state court's application of Supreme Court precedent must have been objectively unreasonable, that is, the federal habeas court should not grant the petition unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Id.* at 414.

A federal court may also grant relief under § 2254(d)(2), where the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  As under § 2254(d)(1), the test here is objective unreasonableness.  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing *Williams*, 529 U.S. at 399).  The federal court, however, must also give deference to state court factual findings.  Section 2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

The relationship between § 2254(d)(2) and § 2254(e)(1) is somewhat unclear.  *Lambert v. Blackwell*, 387 F.3d 210, 235 (3d Cir. 2004), *cert. denied*, 544 U.S. 1063 (2005).  Both provisions are "generally indicative of the deference AEDPA requires of state court factual determinations," but each addresses a slightly different inquiry.  *Id.*  Section 2254(d)(2) addresses challenges to a state court's decision based on the evidence presented in the state proceedings.  *Miller-El*, 537 U.S. at 340; *Lambert*, 387 F.3d at 235.  That section requires the federal habeas court to decide whether the state court's determination was

reasonable or unreasonable given the totality of the evidence presented. *Miller-El*, 537 U.S. at 340; *Lambert*, 387 F.3d at 235. Section 2254(e)(1), on the other hand, addresses challenges to the state court's individual factual determinations, rather than the decisions based on those determinations. *Miller-El*, 537 U.S. at 341; *Lambert*, 387 F.3d at 235. Where a petitioner attacks specific factual determinations of the state court that are subsidiary to the ultimate decision, § 2254(e)(1) requires that the state court's determinations be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence. *Lambert*, 387 F.3d at 235. In sum, a federal habeas court reviews the facts found by a state court under § 2254(e)(1), but the legal decision based on those facts under § 2254(d)(2). *Miller-El*, 537 U.S. at 341; *Lambert*, 387 F.3d at 235-36.

Finally, "by its own terms § 2254(d) applies only to claims already 'adjudicated on the merits in State court proceedings.' It follows that when, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA ... do not apply." *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). Instead, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA. However, the state court's factual

determinations are still presumed to be correct, rebuttable upon a showing of clear and convincing evidence." *Id.*

## IV.   DISCUSSION

Johnson's petition advances three grounds for relief:  (1) the evidence presented at trial was insufficient to support his convictions in violation of due process, (2) the prosecutor committed a *Brady* violation by failing to reveal a plea agreement between the government and witness Victoria Doubs, and (3) trial counsel was ineffective for failing to request appropriate jury instructions on witness credibility and inconsistent statements.[8]  Respondents argue that Johnson's first and second claims are procedurally defaulted and, in the alternative, that all of his claims fail on the merits.  The Court will address each of Johnson's claims in turn.

### A.   Sufficiency of the Evidence Claim

-------------------------------------

[8] Johnson's pro se petition raised eight grounds for relief.  Four of these grounds are encompassed in the claims advanced in his submissions prepared by counsel (Johnson's pro se petition split his current ineffective assistance claim into two separate grounds).  The Court construes Johnson's submissions as having abandoned all but the claims presented in the briefs prepared with the assistance of counsel, during the process of winnowing out weaker arguments and focusing on those most likely to prevail.  *See Smith v. Murray*, 477 U.S. 527, 536 (1986); *Jones v. Barnes*, 463 U.S. 745, 751-752 (1983); *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996); *see also United States v. Essig*, 10 F.3d 968, 973 (3d Cir.1993) (observing that a court is generally not required to review a counseled defendant's pro se arguments).

Johnson first argues that his convictions violated due process because the Commonwealth did not present sufficient evidence to prove his guilt as to each element of the crimes charged beyond a reasonable doubt.  The Respondents contend that Johnson's sufficiency of the evidence claim is procedurally defaulted, and alternatively, that the claim fails on the merits.  For the reasons that follow, the Court holds that Johnson has not procedurally defaulted this claim, but that the evidence presented at trial is sufficient to sustain his convictions.

### 1.    Procedural Default

Respondents first argue that Johnson's sufficiency of the evidence claim was not fairly presented to the state courts because it was presented only as a claim based on state, not federal law.  Respondents contend that a "rule of explicitness" derived from Supreme Court precedent requires a petitioner to explicitly communicate the federal nature of a claim to the state courts.  Because Johnson would now be procedurally barred from explicitly raising a federal due process claim before Pennsylvania courts, the Respondents conclude that Johnson has procedurally defaulted his claim.  Johnson counters that his sufficiency of the evidence claim was fairly presented because the standard for deciding such a claim under Pennsylvania and federal law is the same.  While the law addressing the

issue presented by the parties is less than clear, the Court finds that Johnson has the better argument.

The principle of federal-state comity has long required a state prisoner to give the state courts an initial opportunity to pass upon and correct alleged violations of federal rights before a federal court will entertain his habeas petition. *See Picard v. Connor*, 404 U.S. 270, 275 (1971).  The Supreme Court has emphasized that to exhaust available state remedies "the federal claim must be fairly presented to the state courts....  Accordingly, we have required a state prisoner to present the state courts with the same claim he urges upon the federal courts." *Id.* at 275-76 (citations omitted).  In *Picard*, before the state courts, the petitioner argued that his indictment was invalid under state law.  On appeal of the denial of his habeas petition, the court of appeals held that the indictment violated equal protection.  The Supreme Court reversed, holding that the petitioner had not exhausted his state remedies because the state courts were not provided "with an opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim." *Id.* at 277.  The Supreme Court stated:

> The [Massachusetts] Supreme Judicial Court dealt with the arguments respondent offered; we cannot fault that court for failing also to consider sua sponte whether the indictment procedure denied respondent equal protection of the laws. *Obviously there are instances in which the ultimate question for disposition will be the same despite*

15

> *variations in the legal theory* or factual allegations urged in
> its support.  A ready example is a challenge to a confession
> predicated upon psychological as well as physical coercion.
> *Hence, we do not imply that respondent could have raised
> the equal protection claim only by citing book and verse on
> the federal constitution*.  We simply hold that the *substance*
> of a federal habeas corpus claim must first be presented to
> the state courts.  The claim that an indictment is invalid is
> not the *substantial equivalent* of a claim that it results in an
> unconstitutional discrimination.

*Id.* at 277-78 (citations omitted) (emphasis added).

The Supreme Court again addressed the fair presentation rule in per curiam

opinion in *Anderson v. Harless*, 459 U.S. 4 (1982).  In that case, the petitioner was

convicted of two counts of first degree murder and sentenced to life imprisonment.

Before Michigan courts, the petitioner argued that the trial court's jury instruction

on malice was "erroneous" and in support of that argument relied on *People v.

Martin*, 221 N.W.2d 336 (Mich. 1974), "a decision predicated solely on state law

in which no federal issues were decided, but in which the defendant had argued

broadly that failure to properly instruct a jury violated the Sixth and Fourteenth

Amendments."  *Id.* at 6.  Michigan courts affirmed the conviction, and "[n]ot

surprisingly ... interpreted [the petitioner's] claim as being predicated on the state-

law rule of *Martin*, and analyzed it accordingly."  *Id.* at 7.  On federal habeas

review, the petitioner relied primarily on *Sandstrom v. Montana*, 442 U.S. 510

(1979) in arguing that the malice instruction had unconstitutionally shifted the

16

burden of proof to him at trial.  The district court held that the petitioner had

exhausted state remedies, and the court of appeals affirmed, holding that the "due

process ramifications" of the petitioner's argument to the Michigan courts were

"self-evident" and the petitioner's reliance on *Martin* sufficiently presented the

substance of his federal claim.  *Id.*

The Supreme Court reversed.  The Court held that in fairly presenting a

claim to state courts, "[i]t is not enough that all the facts necessary to support the

federal claim were before the state courts or that a somewhat similar state-law

claim was made" but rather, "the habeas petitioner must have fairly presented to

the state courts the *substance* of his federal habeas corpus claim."  *Id.* at 6

(emphasis added).  The Court held that the *Sandstrom* rationale relied on by the

federal courts in granting the habeas petition had not been presented to the state

courts, and that reliance on *Martin* was not sufficient to do so because the broad

federal due process claim asserted by the defendant in *Martin* was not the same as

the particular claim based on *Sandstrom* asserted by the petitioner.  *Id.* at 7.

The contours of the fair presentation rule were thoroughly explored by the

Third Circuit in *Evans v. Court of Common Pleas*, 959 F.2d 1227 (3d Cir. 1992)

*cert. denied*, 506 U.S. 1089 (1993), a case which involved facts similar to those

presented here.  In that case, the petitioner Evans was convicted of third-degree

17

murder in the Delaware County Court of Common Pleas.  On appeal to the

Pennsylvania Superior Court, she challenged "the evidence as insufficient to refute

[her] claim of self-defense or to prove malice."  *Id.* at 1230 n.4.  The Superior

Court found the evidence sufficient to support the conviction.  In her petition for

allocatur to the Pennsylvania Supreme Court, Evans challenged "the evidence as

insufficient to prove Third Degree Murder and to refute self defense, in violation

of the U.S. Constitution's Due Process Clause."  *Id.*  The Pennsylvania Supreme

Court denied the petition.  Evans then filed a habeas petition, arguing that the

insufficiency of the evidence violated her due process rights under the Fourteenth

Amendment.  The district court held that Evans had failed to exhaust her state

court remedies as to this claim because she did not claim constitutional error until

her petition for allocatur to the Pennsylvania Supreme Court.

On appeal, the Third Circuit found that Evans had fairly presented her claim

to the Pennsylvania courts.  The court stated that fairly presenting a federal claim

to the state courts "requires that the claim brought in federal court be the

substantial equivalent of that presented to the state courts.  Both the legal theory

and the facts underpinning the federal claim must have been presented to the state

courts, and the same method of legal analysis must be available to the state court as

will be employed in the federal court."  *Id.* at 1231 (citations omitted).  The court

18

acknowledged that Pennsylvania courts had addressed Evans' claim only under state law. *Id.* Nonetheless, the court cited its own cases and those of other courts of appeals which "look to the substance of the claim presented to the state courts, rather than its technical designation" in determining whether a federal claim has been fairly presented *Id.*

The Third Circuit first relied on *Bisaccia v. Attorney General of the State of New Jersey*, 623 F.3d 307 (3d Cir.), *cert. denied*, 449 U.S. 1042 (1980), in which the court held that a petitioner's state appeal and habeas petition "were similar enough to satisfy the requirements for exhaustion" of his due process claim because "[t]he petitioner's state claim ... had led the New Jersey Supreme Court into a method of analysis consistent with Fourteenth Amendment due process determinations." *Id.* The court "concluded that because the substance of the appellant's state claim is *virtually indistinguishable* from the due process allegation now before the federal court, and because the method of analysis is *indistinct*, exhaustion of state remedies has been met." *Id.* (emphasis added).

The Third Circuit also cited with approval the analysis of *Daye v. Attorney General of New York*, 696 F.2d 186 (2d Cir. 1982) (en banc), where the court "noted that the ways in which a state defendant may fairly present to the state

courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution", including:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Id.* at 1231-32 (quoting *Daye*, 696 F.2d at 194.)

Next, the *Evans* court relied on *Nadworny v. Fair*, 872 F.2d 1093 (1st Cir. 1989), where the court held that a state prisoner had fairly presented his federal insufficiency of the evidence claim, despite his failure to state explicitly the federal nature of his claim or cite federal precedent in his state court papers. *Id.* at 1232. The *Nadworny* court held that although "substantive deviations between superficially similar federal and state claims often exist, if an individual's claim, arising under and asserted in terms of state law, is *functionally identical* – a point of more than trifling concern – to the federal claim, we must regard the federal claim as fairly presented." *Id.* (quoting *Nadworny*, 872 F.2d at 1099-1100) (emphasis added).  The Third Circuit noted that in *Nadworny*, it was relevant that the test for reviewing sufficiency of the evidence is essentially identical under Massachusetts law as under the federal Constitution. *Id.*

Finally, the *Evans* court relied on *Tamapua v. Shimoda*, 796 F.2d 261 (9th Cir. 1986), where the Ninth Circuit concluded that the petitioner had exhausted his federal due process claim based on because "[s]ufficiency of evidence to convict is a fundamental concern of the due process clause.  Therefore, petitioner's failure to invoke the talismanic phrase 'due process of law' in the state proceedings was not fatal to his claim for habeas relief."  *Id.* (quoting *Tamapua*, 796 F.2d at 263.)

Based on its analysis of these cases, the Third Circuit held that Evans had fairly presented her insufficiency of the evidence claim to the Pennsylvania courts. First, the court concluded that "the test for insufficiency of the evidence is the same under both Pennsylvania and federal law" and "[a]s such, the method of analysis asserted in the federal courts was readily available to the state courts."  *Id.* at 1232-33.  The court also concluded that Evans' insufficiency of the evidence claim qualified as an "assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution" because "the Supreme Court's holding in *Jackson v. Virginia* that a challenge to a state conviction brought on the ground that the evidence cannot fairly be deemed sufficient to have established guilty beyond a reasonable doubt states a constitutional claim, established that *an insufficiency of the evidence claim necessarily implicates federal due process rights*."  *Id.* at 1233 (citation omitted) (emphasis added).

21

The Supreme Court again addressed the fair presentation rule in its per curiam opinion in *Duncan v. Henry*, 513 U.S. 364 (1995).  In that case, the petitioner was convicted of sexual molestation. At trial, the petitioner objected, under the California evidence code, to testimony by the parent of another child who claimed to have been molested 20 years previously.  On direct appeal, he argued that the evidentiary error was a "miscarriage of justice" under the California Constitution.  The California Court of Appeal found the error harmless and affirmed the conviction.  Petitioner's habeas petition argued that the evidentiary error amounted to a denial of due process under the United States Constitution. The district court granted the petition and the Ninth Circuit affirmed, holding that the petitioner had exhausted his federal due process claim because "it is not necessary to invoke 'the talismanic phrase "due process of law"' or cite 'book and verse on the federal constitution.'"  *Id.* at 888 (quoting *Henry v. Estelle*, 33 F.3d 1037, 1040 (9th Cir. 1994)).[9]

The Supreme Court reversed, holding that the petitioner had not fairly presented his federal claim.  The Court stated:

---

[9] This language from the Ninth Circuit's opinion derives from *Tamapua v. Shimoda*, 796 F.2d 261 (9th Cir.1986), which, as discussed above, the Third Circuit relied on in its *Evans* opinion.  *Compare Henry*, 33 F.3d at 1040 (quoting *Tamapua*, 796 F.2d at 262-63) *with Evans*, 959 F.2d at 1232 (same).

> If state courts are to be given the opportunity to correct
> alleged violations of prisoners' federal rights, they must
> surely be alerted to the fact that the prisoners are asserting
> claims under the United States Constitution.  If a habeas
> petitioner wishes to claim that an evidentiary ruling at a
> state court trial denied him the due process of law
> guaranteed by the Fourteenth Amendment, he must say so,
> not only in federal court, but in state court.

*Id.* at 365-66.  The Court noted that the state court, when presented with a claim of

error under the California evidence code, understandably confined its analysis to

the application of state law by asking whether the prejudicial effect of the

testimony outweighed its probative value, not whether it was so inflammatory as to

prevent the fair trial guaranteed by the Fourteenth Amendment.  *Id.* at 366.  The

Court noted that  "those standards are no more than 'somewhat similar,' not

'virtually identical'", and "[b]oth *Picard* and *Harless* emphasized that mere

similarity of claims is insufficient to exhaust."  *Id.* (citations omitted).

The Third Circuit addressed the impact of *Duncan* in *McCandless v.*

*Vaughn*, 172 F.3d 255 (3d Cir. 1999).  There, the court stated:

> We read *Duncan* as reaffirming the teaching of *Harless* and
> *Picard* that the absence of explicit reference to federal law
> does not resolve the issue of whether a federal claim was
> fairly presented.  It also reaffirms, however, that petitioners
> must have communicated to the state courts in some way
> that they were asserting a claim predicated on federal law.

*Id.* at 261.  The court also restated the four examples identified in the *Daye*

decision of ways in which a petitioner may communicate the assertion of a federal

claim without explicitly referencing the federal constitution or statutes.  *Id.* at 261-

62 (citing *Evans*, 959 F.2d at 1232 (quoting *Daye*, 696 F.2d at 194)).  In

*McCandless*, the court found that petitioner had not exhausted two of his federal

due process claims because, like the petitioner in *Duncan*, he had presented these

claims to the state courts only as evidentiary errors which required a different

analysis than due process claims.  *Id.* at 262.

The Supreme Court most recently addressed the fair presentation rule in

*Baldwin v. Reese*, 541 U.S. 27 (2004).  In that case, the petitioner appealed his

kidnaping and attempted sodomy convictions through the Oregon courts and then

sought collateral review in the state courts.  After being denied relief, the petitioner

sought review by the Oregon Supreme Court.  In his petition to that court, the

petitioner argued that both his trial and appellate counsel had provided ineffective

assistance.  He specified that trial counsel's conduct violated the federal

constitution, but did not state that his appellate counsel violated federal law.  After

the Oregon Supreme Court denied review, the petitioner asserted in his habeas

petition that both trial and appellate counsel's ineffective assistance violated the

federal constitution.  The district court found that petitioner had not fairly

24

presented his claim as to appellate counsel because his submissions to the state courts had not indicated that he was complaining about a violation of federal law as to appellate counsel.  The Ninth Circuit reversed, holding that, although the petitioner's submissions did not alert the Oregon Supreme Court to the federal nature of his claim, that court would have realized the claim rested on federal law had they read the opinion of the lower state court.

The Supreme Court reversed, holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Id.* at 32.  In rejecting a rule that would require state appellate courts to read lower court opinions, the Court stated:

> Finally, we do not find such a requirement necessary to avoid imposing unreasonable procedural burdens upon state prisoners who may eventually seek habeas corpus.  A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim "federal."

*Id.*  The petitioner argued that his petition to the Oregon Supreme Court did, in fact, fairly present his federal claim because the Oregon and federal standards for

deciding ineffective assistance claims are identical and therefore by presenting a state-law claim he necessarily presented the corresponding federal claim. *Id.* at 33. The Supreme Court, however, declined to address this argument because the petitioner had not raised the argument before the court of appeals.[10] *Id.* at 34.

In *Nara v. Frank*, 488 F.3d 187 (3d Cir. 2007), the Third Circuit confirmed the continuing validity of the *McCandless* analysis in light *Baldwin.*[11]  In *Nara*, the petitioner pled guilty to first-degree murder in the Fayette County Court of Common Pleas and did not appeal to the Pennsylvania Superior Court.  The petitioner filed several PCRA petitions, arguing that he was mentally incompetent when he pled guilty.  The Commonwealth argued that the petitioner had not exhausted his state remedies with regard to his federal incompetency claim.  The Third Circuit rejected this argument, holding that the Pennsylvania and federal standards for determining competency to enter a guilty plea are the same and that

---

[10] Similarly, in *Howell v. Mississippi*, 543 U.S. 440 (2005), a state court defendant seeking a writ of certiorari to the Mississippi Supreme Court argued that he had presented a federal claim to the state courts for purposes of jurisdiction under 28 U.S.C.§ 1257(a) because his state and federal claims were "virtually identical."  The Supreme Court, "[a]ssuming, without deciding, that identical standards might overcome a petitioner's failure to identify his claim as federal," held that the petitioner's state and federal claims were, in fact, not identical, and therefore dismissed the writ of certiorari as improvidently granted. *Id.* at 444-45.

[11] Although *McCandless* merely reaffirmed the Third Circuit's decision in *Evans*, the parties and the court in *Nara* referred to the analysis of those cases as the "*McCandless* analysis." *See, e.g.*, *Nara*, 488 F.3d at 198 n.17.  For the sake of convenience and consistency, we will also refer to the *McCandless* analysis, but such reference should be understood to encompass the holdings in both *McCandless* and *Evans*.

the petitioner had "repeatedly stat[ed] his claim 'in terms so particular as to call to mind a specific right protected by the Constitution.'" *Id.* at 198-99 (quoting *McCandless*, 172 F.3d at 260). The court further noted that the petitioner had "consistently presented the basic factual outline of a federal claim" and had not required the state courts "to search beyond the pleadings and briefs for a federal issue." *Id.* at 199.

In the margin, the Third Circuit rejected the Commonwealth's argument that "the Supreme Court's decision in *Baldwin v. Reese* may have limited the viability of the *McCandless* analysis" by stating:

> *Baldwin* held that, "ordinarily a state prisoner does not fairly present a claim to a state court if that court must look beyond a petition or a brief (or similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion, that does so." *Baldwin*, 541 U.S. 27, 32 (2004). *Baldwin* concluded that the petitioner's briefs to the state courts in that case did not "fairly present" a federal claim because the briefs cited no case that might alert the state court to the federal nature of the claim, lacked a factual description supporting the claim, and yet cited federal law in support of other claims. *Id.* at 33. These are among the same considerations set out in *McCandless*.

*Id.* at 198 n.17; *see also Tome v. Stickman*, 167 Fed. Appx. 320, 324 (3d Cir. 2006) (stating "*Baldwin* left open the possibility that if a petitioner presents a state claim that state courts evaluate under a standard identical to the federal standard, then

27

presentation of that claim might be sufficient to meet § 2254(b)'s exhaustion requirements" but finding that claims presented in that case were not identical). The Commonwealth advanced this argument again in moving to stay the mandate of the Third Circuit pending its filing of a petition for writ of certiorari, but the court rejected the argument again for the same reasons.[12]  *See Nara v. Frank*, 494 F.3d 1132, 1133 (3d Cir. 2007).

This long and winding road of Supreme Court and Third Circuit precedent leads to several conclusions about when a habeas petitioner has "fairly presented" a federal claim to state courts.  First, a petitioner fairly presents a federal claim when he explicitly identifies before the state courts the federal source of law in which his claim is grounded.  *Baldwin*, 541 U.S. at 32; *Duncan*, 513 U.S. at 365-66.  For example, a petitioner could explicitly reference the particular provision of the Federal Constitution on which his claim is based.  Second, a petitioner fairly presents a federal claim in his submissions to the state courts by relying on state or federal cases deciding his claim on federal grounds.  *Baldwin*, 541 U.S. at 32; *McCandless*, 172 F.3d at 261; *Evans*, 959 F.2d at 1232; *Daye*, 696 F.2d at 194. For example, while not referencing a particular constitutional provision, a

---

[12] The Commonwealth filed a petition for writ of certiorari on November 9, 2007, which remains pending as of the date of this Order.  *See Lawler v. Nara*, No. 07-733 (U.S. Sup. Ct.).

petitioner could rely on a case that analyzed his claim under federal law.  Third, a

petitioner fairly presents a federal claim when he presents the factual and legal

substance of that claim to the state courts.  *Picard*, 404 U.S. at 278; *Harless*, 459

U.S. at 6; *Evans*, 959 F.2d at 1231; *Daye*, 696 F.2d at 194.  For example, although

not explicitly referencing a particular constitutional provision or relying on a case

decided on federal grounds, a petitioner could expressly assert the terms of a

specific right protected by the Constitution or undertake the particular analysis

required to assert a violation of that right.[13]

Application of these concepts to the case at hand demonstrates that Johnson

fairly presented his sufficiency of the evidence claim to the Pennsylvania courts.

As an initial matter, both the Supreme Court and the Third Circuit have explicitly

rejected the Respondents' proposed "rule of explicitness."  *See, e.g.*, *Picard*, 404

U.S. at 278 (stating "we do not imply that respondent could have raised the equal

---

[13] Somewhat suspect in light of the Supreme Court's decisions in *Harless* and *Duncan* is
the statement from *Daye*, echoed in *McCandless* and *Evans*, that a petitioner may fairly present a
federal claim to state courts through "allegation of a pattern of facts that is well within the
mainstream of constitutional litigation."  *Daye*, 696 F.2d at 194.  Although such presentment is
somewhat analogous to presenting the "substance" of a claim to the state courts, this statement
seems closer to the "self-evident" standard rejected in *Harless*, 459 U.S. at 7, and the
"fundamental concern" language from the Ninth Circuit's decision in *Tamapua* which was
rejected in *Duncan*, 513 U.S. at 887-88.  Further, this statement seems inconsistent with the
requirement of *McCandless*, *Evans*, and Supreme Court precedent that a petitioner present not
only the factual but also the legal basis for a federal claim to the state courts.  *See, e.g.*, *Harless*,
459 U.S. at 6 ("It is not enough that all the facts necessary to support the federal claim were
before the state courts...."); *McCandless*, 172 F.3d at 261; *Evans*, 959 F.2d at 1231.

29

protection claim only by citing book and verse on the federal constitution");

*McCandless*, 172 F.3d at 261 ("We read *Duncan* as reaffirming the teaching of

*Harless* and *Picard* that the absence of explicit reference to federal law does not

resolve the issue of whether a federal claim was fairly presented."); *Evans*, 959

F.2d at 1231 (noting some of the "ways in which a state defendant may fairly

present to the state courts the constitutional nature of his claim, even without citing

chapter and verse of the Constitution").

Although Johnson did not label his claim as federal or rely on federal

precedent, the "substance" of his sufficiency of the evidence claim was presented

to the Pennsylvania courts.  As noted in *Evans*, the test for sufficiency of evidence

is the same under both Pennsylvania and federal law.  959 F.2d at 1232.  The

standard applied by the Pennsylvania courts in evaluating Johnson's sufficiency of

the evidence claim was:

> [T]he court must view all of the evidence admitted at trial
> in the light most favorable to the Commonwealth as verdict
> winner and draw all reasonable inferences in favor of the
> Commonwealth.  The court must then determine whether
> the evidence was sufficient to permit the trier of fact to find
> each and every element of the crimes charged was
> established beyond a reasonable doubt. It is the providence
> of the trier of fact to pass upon the credibility of the
> witnesses and the weight to be accorded the evidence
> produced and the fact finder is free to believe all, part or
> none of the evidence.

(Doc. 33-2 at 30; *see also* Doc. 64-6 at 6.)  This standard is indistinguishable from the federal standard:

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Johnson, while relying only on state law, asserted his claim in terms so particular as to call to mind the specific due process right protected by the Fourteenth Amendment as described in *Jackson*. The Pennsylvania courts applied the same legal analysis to the same facts, and presumably came to the same conclusion, as they would have if Johnson had explicitly labeled his claim "federal."  In this way, the Pennsylvania courts were given a fair opportunity to initially pass upon Johnson's claim.  Neither federal-state comity nor judicial economy would be better served by requiring Johnson to return to the state courts simply because those courts' decisions do not include a "see also" citation to *Jackson v. Virginia*.

Although the Supreme Court has not expressly held that a petitioner fairly presents a federal claim to the state courts by asserting a state claim that is evaluated under a standard identical to the federal standard, neither does its

precedent foreclose this result. In fact, the Supreme Court's frequent focus on the similarity of the state and federal claims at issue suggests such a rule. *See, e.g.*, *Duncan*, 513 U.S. at 366; *Harless*, 459 U.S. at 6; *Picard*, 404 U.S. at 277-78.

However, because the Supreme Court has explicitly left unanswered the question presented here, *Baldwin*, 541 U.S. at 34, Third Circuit precedent controls this case. The Third Circuit has held that a petitioner who presents a claim to the state courts which is decided under identical state and federal standards has given the state courts notice of the legal and factual substance of his claim, and that this satisfies the fair presentation rule. *See Nara*, 488 F.3d at 197-98; *McCandless*, 172 F.3d at 261; *Evans*, 959 F.2d at 1231.

The majority of other federal courts to address this question have come to the same conclusion. *See, e.g.*, *Mulnix v. Sec'y for the Dep't of Corr.*, 2007 WL 3498820, at *1 (11th Cir. Nov. 16, 2007) (holding petitioner fairly presented sufficiency of the evidence claim because federal and Florida standards are identical); *Harrison v. McBride*, 428 F.3d 652, 660-63 (7th Cir. 2005) (holding Supreme Court's decision in *Baldwin* does not require more of a petitioner than the four-part test articulated in *Daye* and later adopted by the Seventh Circuit); *Jackson v. Edwards*, 404 F.3d 612, 620-21 (2d Cir. 2005) (holding that petitioner necessarily presented federal claim where state court's inquiry would have been

the same if petitioner had explicitly invoked constitutional provision at issue);

*Sanders v. Ryder*, 342 F.3d 991, 1000-01 (9th Cir. 2003) (holding petitioner fairly

presented ineffective assistance claim where Washington and federal standards are

identical); *Nadworny*, 872 F.2d at 1099-1100 (holding "if an individual's claim,

arising under and asserted in terms of state law, is functionally identical – a point

of more than trifling concern – to the federal claim, we must regard the federal

claim as fairly presented"); *Lowe v. Schomig*, 2007 WL 773881, at *3 (D. Nev.

Mar. 9, 2007) ("The Court can see no reason to find a claim unexhausted when the

claim has been reviewed by the state courts under the identical standard applied to

a claim expressly designated as a federal claim.  Such a claim has been fairly

presented to the state courts and in fact fully reviewed by those courts."); *Walker v.

Palahovich*, 2007 WL 666763, at *6 (E.D. Pa. Feb. 26, 2007) (holding petitioner

fairly presented claim despite citing only to state law because "[t]he state and

federal due process inquires for a claim of prosecutorial misconduct are

substantively identical").  *But see Barton v. Quarterman*, 2007 WL 2051236, at *3

(N.D. Tex. July 16, 2007) (relying on *Baldwin* for holding that "[e]ven if a state

standard is identical to the federal standard of review, a claim must be labeled as a

federal issue in order to be fairly presented").

Based on the precedent detailed above, the Court holds that Johnson fairly presented his federal due process claim based on the sufficiency of the evidence to the Pennsylvania courts, and therefore, has exhausted his available state remedies as to this claim.

### 2.     Merits Analysis

#### a.     Legal standard

"[T]he due process guaranteed by the Fourteenth Amendment [mandates] that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson*, 443 U.S. at 316.   The Court must uphold the jury's verdict if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319.   It is the role of the jury "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.*   Therefore, in reviewing a conviction, the court does not weigh evidence or determine the credibility of witnesses and must credit all available inferences in favor of the government.  *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003).  The court must examine the totality of the evidence,

both direct and circumstantial, *id.* at 170, but the prosecution may meet its burden entirely through circumstantial evidence, *United States  v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006).  This standard of review is highly deferential to the jury's verdict and places an extremely heavy burden on the defendant.  *United States v. Lore*, 430 F.3d 190, 203-04 (3d Cir. 2005).  "[R]eversal on the grounds of insufficient evidence should be confined to cases where the failure of the prosecution is clear." *United States v. Jimenez*, 513 F.3d 62, 81 (quoting *United States v. Carr*, 25 F.3d 1194, 1201 (3d Cir.), *cert. denied*, 513 U.S. 939 (1994)).

### b.    Evidence presented at trial

With this standard of review in mind, the Court will summarize the evidence presented at trial.  The first witness to testify was Laura Davis, a patrol officer with the Harrisburg Bureau of Police.  (N.T. 43.)  Officer Davis testified that she was on patrol in her patrol car in early morning hours of December 15, 1995 when she heard a loud booming sound nearby.  (N.T. 45-46.)  Officer Davis began to search for the source of the shot and encountered a couple who indicated that someone had been shot in an alley between two houses on Market Street.  (N.T. 48.)  Officer Davis then encountered a crowd of people in front of the Midnight Special bar, located on 14th and Market Streets, and an individual there indicated he heard a shot from the 1400 block of Market Street.  (N.T. 49.)  After Officer Davis

searched further, an individual waved her over to an alley between 1420 and 1422 Market Street where she discovered the body of Taraja Williams.  (N.T. 50-51.) The alley was about four feet wide and extended eight to ten feet back to a fence. (N.T. 58-60.)  The body was found just inside the alley.  (N.T. 51.)

The next witness was Leroy Lucas, a member of the Harrisburg police department's forensics unit.  (N.T. 68.)  When Officer Lucas arrived at the crime scene, he observed multiple sets of footprints leading from the victim back into the alley toward the six-foot fence and on the other side of the fence through the alley. (N.T. 70.)  Officer Lucas also recovered from the scene a partial shotgun, with the barrel missing.  (N.T. 71.)  Officer Lucas testified that the body of the victim was approximately ten feet from the fence, relatively close to the sidewalk at the entrance to the alley.   (N.T. 73, 82.)

The next witness was Gary Miller, the son of the owner of the Midnight Special bar.  (N.T. 88, 89-90.)  Miller testified that he was working at the bar the night of December 14-15, 2005 and recalled seeing Williams and Corey Walker in the bar but did not recall seeing Lorenzo Johnson.   (N.T. 90-91.)  Miller testified that he was working when he heard the doorman yelling "you all got to take that out of here" and then went to the door where he saw Walker and Williams leaving. (N.T. 93-94.)

The next witness was Carla Brown, a friend of the victim.  (N.T. 98-99.)

Brown testified that she was in the bar on the night of December 14-15, 2005 and

 saw Walker, Johnson, and Williams engaged in an argument.  (N.T. 102-03.)

Brown could not hear what they were saying, but the argument involved "a lot of

arm movements."  (N.T. 103-04.)  Before long, the bouncer told the three men to

leave.  (N.T. 102.)  Brown followed Walker, Johnson, and Williams as they left the

bar "because she wanted to know what was going on."  (N.T. 104.)  Brown recalled

that Walker was wearing a long leather coat and walked as if he had something

hidden under it.  (N.T. 104-05.)  The three men walked in a single-file line with

Walker in the front, Williams in the middle, and Johnson in the back.   (N.T. 106.)

Brown followed slowly behind with her hood up acting like any other person on

the street so that Walker and Johnson did not notice her, but Williams, who knew

her, did.  (N.T. 106.)  The three men continued walking single file until they

reached the alley where Walker entered first, Williams entered next, and Johnson

remained at the entrance.  (N.T. 106, 108.)  As she approached the alley, Williams

told Brown to keep going.  (N.T. 107.)  Brown walked a few feet beyond the alley

when she heard a loud boom and ran.  (N.T. 109-10.)

Brown admitted that she had been addicted to cocaine and that she was high

on cocaine at the time of the killing.  (N.T. 112.)  The amount of drugs in her

system, on a scale of one to ten, was about a seven.  (N.T. 151.)  She also stated that after the incident she ran to a friend's house and got high.  (N.T. 128-29, 144.) Brown testified, however, that she had been clean for nine months and was currently employed.  (N.T. 114-15.)  Brown admitted that at the preliminary hearing in the case she had testified that she was drunk at the time of the incident but not on drugs.  (N.T. 121, 152-53.)

Brown testified that she did not contact police because she was scared that she would be killed too.  (N.T. 129-30, 154-55.)  Brown admitted that, when she was first contacted by police, she told them she knew nothing about the incident. (N.T. 131-32.)

Brown also testified that while she knew who Victoria Doubs was after being shown a photograph of her, she was not friends with Doubs and had never talked to Doubs about the incident.  (N.T. 115, 130-31.)

The next witness was Aaron Dews, an in-house advisor at Visions Youth Works which was located in one of the buildings bordering the alley.  (N.T. 156-57.)  Dews testified that he and another staff member heard a loud boom on the night of the incident.  (N.T. 159.)  After checking to see if it was the furnace, Dews looked out the window and saw two silhouettes running up the driveway away

from the house.  (N.T. 159-60.)  Dews stated that he could not see the two

individuals in detail because there was plastic over the window.  (N.T. 161.)

The next witness was Brian Ramsey, a friend of the victim.  (N.T. 164-65.)

Ramsey testified that Williams was a cocaine addict who sometimes sold drugs to

support his habit.  (N.T. 166.)  He stated that he knew who Walker and Johnson

were and that he had seen them together most of the time.  (N.T. 167.)  Ramsey

testified that on the night of the incident, he was selling drugs on Market Street

near the Midnight Special bar.  (N.T. 169.)  Williams was also out on Market

Street making runs for drug dealers that night.  (N.T. 171.)  Ramsey first testified

that, when he last saw Williams, he was moving into an alley with two individuals.

(N.T. 174.)  On cross-examination, Ramsey corrected himself, stating that he saw

three individuals with Williams, one female and two males.  (N.T. 186-88.)  This

testimony was consistent with the statement he gave police on the night of the

incident.  (N.T. 191.)  Ramsey testified that one of the individuals with Williams

walked with a limp, so Ramsey assumed it was a "crippled guy" whom he knew to

be a drug dealer.  (N.T. 176.)  Ramsey stated he assumed Williams was in the alley

to make a drug deal.  (N.T. 174.)  However, he testified that "I would say he was

forced in that alley."  (N.T. 189.)

A minute after Ramsey saw Williams and the individuals enter the alley, he heard a loud boom.  (N.T. 176-77.)  After Ramsey heard the shot, he walked around the block.  (N.T. 177.)  When he returned, he noticed Walker and Johnson among the crowd of people in front of the Midnight Special bar.  (N.T. 178.)  Ramsey testified that Walker and Johnson seemed stunned, "like sort of maced ... like what happened, Taraja has been killed ... are you serious."  (N.T. 179.)

Ramsey admitted that he was serving a sentence in Dauphin County Prison, that he was under the influence of cocaine on the night of the incident, and that while he was still a drug addict, he was in recovery.   (N.T. 164, 166, 168, 193.)

The next witness was Detective Kevin Duffin of the Harrisburg Bureau of Police, who investigated the Williams murder.   (N.T. 197-98.)  Detective Duffin testified that, at around noon on December 15, 1995, he was in an unmarked car when he approached three individuals in a brown Ford.  (N.T. 200.)  The Ford sped away at a high rate of speed in an attempt to get away from him.  (N.T. 200.)  Detective Duffin placed a light on the roof of his car and pursued the Ford.   (N.T. 205-06.)  When the Ford struck another car, the three occupants fled on foot.  (N.T. 206-07.)  Two of the individuals were apprehended.  (N.T. 207.)  One of them was Johnson.  (N.T. 207.)

The next witness, Victoria Doubs, testified that she, Walker, and Johnson were "close friends" who "ran the streets together." (N.T. 211, 212-13.) On December 14, 1995, Doubs, Walker, and Johnson woke up together at around 11:00 a.m. in a house at 18th and Carnation Streets. (N.T. 214.) They went out to buy some marijuana and then were hanging out in front of the Kentucky Fried Chicken near 14th and Market Streets. (N.T. 215.) When Williams approached, Walker went over to talk to him and the two of them walked back toward Johnson and Doubs. (N.T. 217.) Doubs testified that Walker and Williams "were talking about the money that Taraja [Williams] had owed us." (N.T. 217.) Walker continued to confront Williams about the money. (N.T. 218.) Williams "started getting smart," began "cussing out" Walker, and told "him he'd give it to him when he felt like and he ain't scared of him." (N.T. 218.) Walker hit Williams and they started to fight. (N.T. 218.) Williams won the fight, beating Walker with a broomstick. (N.T. 218-19.)

Many people saw Williams beat Walker, which made Walker very angry. (N.T. 219.) After the fight, Walker, Johnson, and Doubs left. (N.T. 219.) Doubs and others laughed at Walker and made jokes. (N.T. 220.) Walker stated "I'm going to kill that crackhead. I'm going to kill that kid." (N.T. 221.) Doubs testified that Walker "was hot. He was heated." (N.T. 221.) Johnson was present

41

when Walker made these statements.  (N.T. 221.)  Walker, Johnson, and Doubs

returned to the house at 18th and Carnation Streets where others were told about

the fight and also made fun of Walker.  (N.T. 221.)  This made Walker angry and

he repeated that he was "going to kill that kid."  (N.T. 221-22.)

Doubs testified that she first told police that late on the night of December

14, 1995, she, Johnson, Suquan Ripply, "a guy named Cliff, and a girl named Ree-

Ree" were on their way to New York.  (N.T. 222-25.)  The next time Doubs met

with police, however, she told them that she had lied and did not actually recall

being in New York on the night of the murder.  (N.T. 225.)  Doubs told police that

she had made up her initial statement because "she was going to be paid to tell that

story.... [M]y bail was supposed to be paid."  (N.T. 225.)  Doubs explained that one

of Walker and Johnson's friends named Larry was going to pay her to tell the story

to police.  (N.T. 227.)  Doubs stated that she went to New York with this same

group "two to three times a week," but could not say that she was in New York

with Johnson on December 14 or 15, 1995.  (N.T. 225-26.)

Finally, Doubs testified that sometime after Williams' death, she ran into

Carla Brown and that the two of them got high together.  (N.T. 227-28.)  Doubs

testified that, while they were smoking crack together, Brown stated that Walker

had given her a couple of crack rocks to take Williams into the alley on the night of the murder.  (N.T. 228.)

On cross-examination, Doubs admitted that she had a conviction for forgery in connection with stolen checks.  (N.T. 238-39.)  Doubs also admitted that she was in Dauphin County Prison on a robbery conviction.  (N.T. 239.)

The next witness was Sergeant Frederick Wentling of the Pennsylvania State Police who testified about the partial shotgun recovered from the crime scene. (N.T. 241-78.)

The next witness was Suquan Ripply, who was incarcerated in Dauphin County Prison at the time.  (N.T. 257-58.)  Ripply was one of the individuals that fled from Detective Duffin on December 15, 1995.  (N.T. 259.)  Ripply first testified that he, Johnson, David Hairston, Vicki Doubs, a man named Clifton, and woman named Ree-Ree left Harrisburg for New York around 4:00 p.m. on December 14, 1995 and did not return until 4:00 a.m. on December 15, 1995. (N.T. 260-61.)  Ripply admitted that he had initially told police this same story, but later told police that this story was false and that he was not in New York with Johnson on the night of the murder.  (N.T. 265-66.)  On the stand, Ripply testified that his first statement was actually correct and that he told Detective Duffin "what he wanted to hear" after the detective told him he would be charged with perjury if

he was lying.  (N.T. 262-64.)  On re-cross examination, Ripply admitted that he made the trip to New York with Johnson many times, that he was "off with the dates" when he made his first statement to police, and was "not exactly" sure whether he was with Johnson in New York on December 14 or December 15. (N.T. 272-75.)

The next witness, Dr. Wayne Ross, medical examiner, testified that the cause of Williams' death was a shotgun wound to the chest.  (N.T. 279-93.)

The next witness, Eric Chambers, a bouncer at the Midnight Special bar, testified that he was at the bar on the night of the incident, and saw Williams and others get kicked out, but did not see Johnson there that night.  (N.T. 297-302.)

The next witness, Lashawyn Jackson, was Walker's girlfriend and testified that Walker was with her in the Midnight Special bar all night on December 14-15, 1995.  (N.T. 312-13, 315.)  On cross-examination, however, Jackson was uncertain of the date that she and Walker were in the bar.  (N.T. 325-28.)  Jackson also admitted that she never contacted the police to provide this information after Walker's arrest.  (N.T. 320-25.)

The final witness, Clifton Germaine, was a friend of Walker and Johnson who testified that on a date he could not remembered he, Johnson, and a woman

whose name he could not remember went to New York.  (N.T. 333-35.)  Germaine

did not know who Suquan Ripply or Victoria Doubs were.  (N.T. 334, 337.)

### c.      State-court decisions

Johnson first presented his sufficiency of the evidence claim in his post-

sentence motion to the Court of Common Pleas.  The court recounted in detail the

facts adduced at trial and rejected Johnson's argument.  (Doc. 33-2 at 27-29, 31.)

The court's analysis was as follows:

> The Commonwealth presented the testimony of Carla
> Brown who followed the two defendants and the victim in
> the alley where the victim was ultimately shot.  She stated
> that Corey Walker was walking with a limp and it looked
> to her as if he was concealing something under his coat....
> [I]t was for the jury to determine whether the circumstantial
> evidence, especially the testimony of Carla Brown
> concerning her observations, was enough to find beyond a
> reasonable doubt that the defendants were responsible for
> the victim's death.  Victoria Doubs' testimony provided a
> motive for the defendants' attack.  She stated that earlier on
> the day of the incident the victim and Corey Walker had an
> altercation and that the victim embarrassed the defendant in
> front of his friends and associates.  She stated that the
> defendant repeatedly remarked that he was going to kill the
> victim.  Although both defense counsel tried to discredit
> this witness' testimony based on her character, prior
> convictions and current incarceration, it was solely within
> the province of the jury to determine whether her testimony
> was credible.  Both defendants presented alibi witnesses
> who testified that they were not in the vicinity of the
> shooting at the time of incident.  Suquan Ripply testified
> that Lorenzo Johnson was with him in New York at the
> time of the incident and Corey Walker's girlfriend,

> Lashawnyn [sic] Jackson, testified that Corey was with her at the Midnight Special Bar the entire evening of the incident.  Again, it was for the jury to determine whether the purported alibi defenses were meritorious.

(*Id.* at 31-32.)

Johnson again raised a sufficiency of the evidence argument on direct appeal.  The Superior Court adopted the Court of Common Pleas' summary of the evidence, and affirmed Johnson's conviction.  (Doc. 64-6 at 3-5, 6.)  The Superior Court's analysis was:

> The various witnesses' testimony revealed that Lorenzo Johnson, Corey Walker, and the victim were arguing inside the Midnight Special Bar and were told to leave.  The trio walked out, with the victim between Lorenzo Johnson and Corey Walker.  They proceeded into an alley, and a shot was heard.  Two men were observed fleeing the scene, and the victim's body was discovered in the alley.  Presented with this evidence, the jury had a sound basis upon which to conclude that a conspiracy existed between Lorenzo Johnson and Corey Walker to murder Taraja Williams.

(*Id.* at 6.)

### d.    Analysis

In reviewing the sufficiency of the evidence, a federal habeas court must apply "the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16.  In this case, Johnson was convicted of first-degree murder as an accomplice.  Under Pennsylvania law, "[a] person is guilty of an

46

offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both." 18 Pa. C.S.A. § 306(a). "A person is legally accountable for the conduct of another person when ... he is an accomplice of such other person in the commission of the offense." 18 Pa. C.S.A. § 306(b). "A person is an accomplice of another person in the commission of an offense if: (1) with intent of promoting or facilitating the commission of the offense, he: (i) solicits such other person to commit it; or (ii) aids or agrees or attempts to aid such other person in planning or committing it." 18 Pa. C.S.A. § 306(c).

"Accordingly, two prongs must be satisfied for a person to be labeled an 'accomplice.' First, there must be evidence that the person intended to aid or promote the underlying offense. Second, there must be evidence that the person actively participated in the crime by soliciting, aiding, or agreeing to aid the principal." *Commonwealth v. Rega*, 933 A.2d 997, 1015 (Pa. 2007) (quoting *Commonwealth v. Murphy*, 844 A.2d 1228, 1234 (Pa. 2004)). "While these two requirements may be established by circumstantial evidence, a defendant cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene. There must be some additional evidence that the defendant intended to aid in the commission of the underlying crime, and then did or attempted to do so." *Murphy*, 844 A.2d at 1234. Unlike criminal conspiracy,

there is no requirement to show that the defendant reached an agreement with the principal to find accomplice liability; mere rendition of aid is sufficient. *Id.*; *Commonwealth v. Kimbrough*, 872 A.2d 1244, 1251 (Pa. Super. Ct. 2005). "With regard to the amount of aid, it need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime." *Murphy*, 844 A.2d at 1234. "The least degree of concert or collusion is sufficient to sustain a finding of responsibility as an accomplice." *Commonwealth v. Coccioletti*, 425 A.2d 387, 390 (Pa. 1981).

Johnson was also convicted of criminal conspiracy. "A person is guilty of conspiracy with another person ... to commit a crime if with the intent of promoting or facilitating its commission he:  (1) agrees with such other person ... that they or one or more of them will engage in conduct which constitutes such crime ... or (2) agrees to aid such other person ... in the planning or commission of such crime."  18 Pa. C.S.A. § 903.  "To convict a defendant of conspiracy, the trier of fact must find that:  (1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another (a 'co-conspirator') to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime.  The essence of a criminal conspiracy, which is what

48

distinguishes this crime from accomplice liability, is the agreement made between the co-conspirators." *Murphy*, 844 A.2d at 1238. "Once the trier of fact finds that there was an agreement and the defendant intentionally entered into the agreement, that defendant may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act." *Id.*

"Direct evidence of the defendant's criminal intent or the conspiratorial agreement, however, is rarely available. Consequently, the defendant's intent as well as the agreement is almost always proven through circumstantial evidence, such as by the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators." *Id.* (quoting *Commonwealth v. Spotz*, 716 A.2d 580, 592 (Pa. 1998)). "Among the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. The presence of such circumstances may furnish a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred." *Commonwealth v. Lambert*, 795 A.2d 1010, 1016 (Pa. Super. Ct. 2002). However, "[a]s with accomplice liability, mere association with the

perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient to establish that a defendant was part of a conspiratorial agreement to commit the crime.  There needs to be some additional proof that the defendant intended to commit the crime along with his co-conspirator." *Murphy*, 844 A.2d at 1238 (quoting *Lambert*, 795 A.2d at 1016).

Both Pennsylvania courts to address the merits of Johnson's claim found the evidence sufficient for the jury to find these elements beyond a reasonable doubt. Based on the evidence detailed above, viewed, as it must be, in the light most favorable to the jury's verdict, the Court cannot conclude that the Pennsylvania courts' decisions were contrary to, or involved an unreasonable application of, federal law or were based on an unreasonable determination of the facts.

Johnson does not dispute that Williams was killed with a shotgun or that Walker was the principal in this offense.  The evidence presented at trial also established the following:  Johnson and Walker were close friends who were almost always together.  Williams owed them money which he refused to pay.[14] On the day of the murder, Johnson witnessed his friend being beaten and

---

[14] Johnson argues that Doubs' testimony that Williams owed "us" money is unclear and that the debt could have been owed to Walker alone.  However, given the testimony of Doubs and other witnesses regarding the close relationship between Walker and Johnson, and the context of Doubs' testimony which addressed the actions and relationship of herself, Walker, and Johnson collectively, it was reasonable for the jury to take Doubs' testimony at face value and find that Williams owed the money to all three collectively.

humiliated by Williams and was present when Walker repeatedly stated that he was going to kill the victim.  Shortly before the murder, Johnson, Walker, and Williams engaged in an argument at the Midnight Special bar, which was heated enough to result in the three being thrown out of the bar.  After leaving the bar, the three men walked in a single file line to the alley where the victim was shot, with Walker in front, the victim in the middle, and Johnson in the rear.  Walker moved as if he had something hidden under his long coat.  Walker entered the alley, followed by the victim[15], and Johnson stood at the entrance of the four-foot-wide walkway.  Very shortly thereafter, a loud shot was heard from the alley, and two individuals were seen running from the rear of the alley.  The victim's body was found near the entrance to the alley, and multiple sets of footprints were found leading from the body to a fence in the middle of the alley and on the opposite side of the fence out the rear of the alley.  The next day, Johnson fled from the detective investigating the murder.[16]

From this evidence, a rational jury could convict Johnson as an accomplice. A jury could find that Johnson intended to aid Walker from the evidence regarding their close relationship; the debt that Williams owed them but refused to pay; the

---

[15] Ramsey testified that Williams was "forced" into the alley.

[16] Further, the jury was entitled to weigh the dubious credibility of the alibi statements provided by Victoria Doubs, Suquan Ripply, and Clifton Germaine.

beating that Williams inflicted on Walker as Johnson looked on; Walker's repeated statements, in Johnson's presence, that he was going to kill Williams; and Johnson's participation in the argument with Williams at the bar. A jury could also rationally infer that Johnson aided or attempted to aid Walker in killing Williams from the evidence showing that Johnson walked ("forced") Williams into the alley, stood at the entrance to the alley when Williams was shot, and fled from the officer investigating the murder.

Similarly, a rational jury could find the agreement between Johnson and Walker required to convict Johnson of criminal conspiracy through the circumstantial evidence presented, including Johnson's: (i) close association with Walker, (ii) awareness of Walker's threats to kill Williams, (iii) consciousness of guilt reflected in fleeing from police, (iv) participation in multiple altercations with Williams, (v) presence at the scene of the crime, (vi) participation in the offense by walking Williams into the alley and standing at the exit, and (vii) Doubs' testimony that Johnson's and Walker's friend paid her give a false alibi.

Johnson argues that the Commonwealth proved only his presence at the scene of the crime, which is insufficient to sustain his convictions. This argument, however, ignores much of the evidence presented at trial and the reasonable inferences that the jury could permissibly draw from such evidence. As an initial

matter, Johnson's presence at the crime scene, while not enough to establish guilt by itself, is relevant evidence to be considered by the jury. *See, e.g.*, *Lambert*, 795 A.2d at 1016. Moreover the evidence presented at trial established more than Johnson's mere presence at the scene. Following the altercation between Walker and Williams earlier in the day, and directly following the argument with Williams that got them kicked out of the bar, Johnson walked Williams into the alley where he was shot and then stood at the entrance. Johnson argues that there was no evidence to show that he "was purposefully walking with the other two men, as opposed to only walking in the same general direction as them" and that, while the evidence showed he stood at the entrance to the alley after Williams entered, "there was no evidence that he was purposefully at this location at the time of the shooting." (Doc. 33 at 19.) These arguments stretch the bounds of credulity. Johnson completely ignores Brown's testimony that he walked Williams into the alley and Ramsey's testimony that Williams was forced into the alley. Further, in light of the multiple altercations with Williams that day, including the heated argument in the bar only moments before, it is certainly a rational inference that Johnson intentionally walked Williams toward the alley and then purposefully stood blocking the entrance. Indeed, it is difficult to conceive how any rational trier of fact could conclude from the evidence presented that Johnson just happened

to be walking in the same direction as Walker and Williams and serendipitously stopped at the entrance to the alley while Williams was shot.

Johnson also argues that the Commonwealth's evidence of his presence at the scene of the crime, knowledge of the crime, and association with Walker are insufficient to establish the requisite intent to prove accomplice liability or the agreement required to prove criminal conspiracy. While Johnson is correct that mere presence, knowledge, or association *each by itself* is insufficient to prove accomplice liability or criminal conspiracy, these circumstances, when "viewed in conjunction with each other and in the context in which they occurred" are relevant proof of such charges. *Lambert*, 795 A.2d at 1016. As discussed above, these factors, viewed in the context of the relationship between Walker, Johnson, and Williams and the conduct of the parties, are sufficient to support the jury's verdict in this case.

Similarly, Johnson argues that evidence of motive and his flight from investigating officers is insufficient to support his convictions. Again, Johnson is correct that motive or consciousness of guilt *alone* are insufficient support a finding of guilt, but in this case Johnson's motive and flight were only some of the pieces of circumstantial evidence supporting his convictions. The jury was entitled

to weigh this relevant evidence with the rest, and the verdict the jury reached is supported by the totality of the evidence presented.

The evidence presented at trial, viewed in the light most favorable to the prosecution, was sufficient under *Jackson v. Virginia* to allow a rational trier of fact to find Johnson guilty of the elements of the charged crimes beyond a reasonable doubt.  The Pennsylvania courts' identical decision under the identical state-law standard therefore was not contrary to, and did not involve an unreasonable application of, clearly established federal law.

Finally, Johnson also argues that the Superior Court relied on three "incorrect" facts in its decision and therefore its decision "was based on an unreasonable determination of the facts" under 18 U.S.C. § 2254(d)(2).  As an initial matter, the Superior Court adopted and quoted in full the trial court's recitation of the evidence, which Johnson does not claim was unreasonable.  (*See* Doc. 64-6 at 3-5.)  The Superior Court clearly based its decision on the totality of this evidence, and the fact that the court further summarized the evidence in presenting its analysis does not render its decision unreasonable.  Moreover, Johnson's challenges to the Superior Court's individual factual recitations are without merit.  First, Johnson quibbles with the court's statement that "they" – meaning Johnson, Walker, and Williams – "proceeded into an alley", contending

that Johnson never entered the alley.  This argument is mere semantics.  The

evidence established that the three men walked in a single file line to the alley,

with Johnson directly behind Williams, and that Johnson stood at the entrance to

the alley.  The court's statement was accurate.  Second, Johnson argues that the

court's statement that "two men were observed fleeing the scene" is incorrect since

Aaron Dews, the only witness to so testify did not know the gender of the

individuals because he was looking through plastic-covered windows.  Dews did

testify that he saw two "silhouettes" fleeing, rather than two "men."  However, in

its recitation of the facts, the Superior Court also quoted from the Court of

Common Pleas' opinion, stating that Dews "heard a loud boom and when he

looked out the window he saw two silhouettes running out the driveway."  (Doc.

64-6 at 4.)  In the context of the totality of the evidence – which the Superior Court

clearly recited and reviewed – one instance of arguably poor word choice  does not

render the court's decision objectively unreasonable.  Finally, Johnson contends

that the court incorrectly stated that he, Walker, and Williams were arguing in the

bar.  Johnson argues that because Carla Brown did not hear the contents of the

argument, it is possible that he was only "passively listening" or, in fact, was

attempting to dissuade Walker from taking any action against Williams.  Brown,

however, testified that Johnson was involved in the argument, and the argument

was contentious enough to result in Johnson being thrown out of the bar.  Further,

given the evidence of Johnson and Walker's close relationship, the money that

Williams' owed them, and the beating inflicted on Walker earlier that day, a

rational jury could reasonably infer that Johnson participated in the argument on

Walker's side.  The Superior Court's decision that the evidence presented at trial

sufficiently supports Johnson's convictions was not based on an unreasonable

determination of the facts, and therefore, Johnson's sufficiency of the evidence

claim will be denied.

**B.**     *Brady* **Claim**

Johnson's second claim is that his due process rights were violated by the

failure of the prosecution to disclose the existence of a plea agreement between the

government and witness Victoria Doubs.  The Respondents argue that Johnson's

*Brady* claim is procedurally defaulted because it was denied as procedurally barred

by the state courts.  Alternatively, the Respondents argue that Johnson's claim fails

on the merits.  The Court finds that Johnson's *Brady* claim is procedurally

defaulted and will deny the claim on that ground.

**1.     Background**

On February 10, 1997, Victoria Doubs pled guilty in the Dauphin County

Court of Common Pleas to criminal conspiracy to commit robbery and theft by

57

unlawful taking.  (Doc. 33-2 at 59.)  Doubs pled guilty pursuant to a negotiated

plea agreement in exchange for a county sentence.[17]  (*Id.* at 60.)  These charges

were prosecuted, and the plea agreement was entered into by, the Office of the

District Attorney of Dauphin County (the "county prosecutor").  (*See id.* at 59.)

 The court accepted Doubs' plea and deferred sentencing to the call of the county

prosecutor.  (*Id.* at 64.)

On March 14, 1997, Doubs testified at Johnson and Walker's trial.  On

cross-examination, Doubs testified that she had come to court from Dauphin

County Prison where she was incarcerated on robbery charges.  (N.T. 238-39.)

The following exchange then occurred between Doubs and Johnson's counsel:

> Q   Now, has [the prosecutor] Mr. Abruzzo made any
>      kind of assurances or promises to you with respect to
>      that charge you have coming up in relation to the
>      testimony you're giving here today?
>
> A   No, he hasn't.
>
> Q   He hasn't promised you any kind of leniency or
>      anything?
>
> A   No, he hasn't.
>
> Q   Did he tell you that he'd do whatever he could to
>      help you out?

---

[17]A "county sentence" is a sentence of a maximum of two years imprisonment served in a
county jail, rather than a state prison

A      No, he didn't.

(N.T. 239-40.)

On March 26, 1997, Doubs was sentenced on the charges to which she had

pled guilty in the Dauphin County Court of Common Pleas.  (Doc. 33-2 at 65.)

The county prosecutor explained the reasons for the plea agreement with Doubs:

> The reason for the agreement was the – her involvement
> was one as a conspirator.  She waited in the car.  She didn't
> do anything.  The overt act were [sic] committed by the co-
> felon....
>
> The reason for the agreement was, my only proof was the
> testimony of the principal and I wasn't real comfortable
> using the principal against the accomplices.  So I gave her
> a pretty good deal rather than having to give him too....
>
> The agreement was that I wouldn't charge her with robbery
> and that she would waive it in for county sentence.  The
> Court should also be aware that Miss Doubs testified in the
> case against Corey Walker and Lorenzo Wallace [sic].
>
> There were no promises made to her in connection with her
> testimony.   However, I consider her cooperation very
> relevant.  She was an important witness.
>
> The Attorney General's Office informed me that she was
> very  cooperative,  and  that  should  be  taken  into
> consideration in imposing sentence.

(Doc. 33-2 at 67-68.)

At the hearing on Johnson's first PCRA petition, Johnson's trial counsel,

Deanna Wagner Muller, testified that, at the time of trial, she was aware that

charges were pending against Doubs but was not aware that Doubs had already

pled to those charges.  (Doc. 66-25 at 14-16.)  Muller testified that she inquired of

Johnson's prosecutor whether any plea negotiation had been offered to Doubs, and,

at the time of trial, was told that Doubs had not received any kind of plea or deal.

(*Id.* at 18-19.)  Muller indicated that, had she been aware of Doubs' plea agreement

at the time of trial, she would have used that information in cross-examining

Doubs.  (*Id.* at 16, 19.)  Muller further testified that Johnson's prosecutor followed

an "open file" policy, allowing her access to everything in the his file.  (*Id.* at 39.)


Christopher Abruzzo of the Pennsylvania Attorney General's Office, the

prosecutor at Johnson and Walker's trial, also testified at the PCRA hearing.

Abruzzo testified that, at the time of trial, he was unaware of any plea agreement

between Doubs and the Dauphin County District Attorney.  (*Id.* at 77.)  Abruzzo

stated that he never offered Doubs anything in exchange for her testimony, and in

fact, affirmatively indicated to Doubs that she would get no benefit from her

testimony.  (*Id.*  at 77, 83-84.)  Abruzzo indicated that Doubs had already provided

a statement to police regarding the case and that she was going to be subpoenaed to

testify based on that statement.  (*Id.*  at 77-78.)  Because Doubs had already given

this statement to police, Abruzzo never considered making her any kind of deal.

(*Id.* at 77-78, 79.)  After trial, and prior to Doubs' sentencing, the attorney from the Dauphin County District Attorney's Office who was prosecuting the charges against Doubs contacted Abruzzo to ask whether Doubs had been cooperative and testified truthfully at trial, and Abruzzo indicated to the county prosecutor that she had.  (*Id.* at 77, 79-80.)

### 2.    State-Court Decisions

In his post-trial motions and direct appeal, Johnson did not raise any argument based on the prosecution's alleged failure to disclose a plea agreement with Doubs.  In his first PCRA petition, citing both to *Brady* and Pennsylvania precedent, Johnson argued that he "was denied his constitutional right to a fair trial, in that the Commonwealth attorney failed to correct the perjured testimony of Victoria Doubts, in that Ms.  Doubs testified she was not promised or expected leniency for her pending criminal charges."  (Doc.  66-2 at 18-20.)

The Court of Common Pleas rejected Johnson's argument and found that his due process rights had not been violated.  (Doc.  33-2 at 88.)  The court reasoned:

> While the prosecution has a duty to disclose to the defense, the court and the jury the existence of a plea agreement with a prosecution witness, we do not believe any such agreement existed herein.  The record of Doubs' sentencing does not support a claim that Doubs received favorable treatment for any reason related to her testimony in the Johnson trial.  The statements to the court by the prosecutor in the robbery case reflects [sic] that the plea agreement for

61

> a county sentence was based upon weaknesses in the
> county case against Doubt, not a *quid pro quo* for testimony
> in the homicide case....
>
> Accordingly, because no agreement existed with the Office
> of the Attorney General, the Commonwealth breached no
> duty to disclose which resulted in deprivation of
> [Johnson's] due process rights.

(*Id.* at 89-90.)

Johnson reiterated his *Brady* argument in the appeal of his PCRA petition to

the Superior Court.  (Doc. 66-5 at 13-16.)  The Superior Court held that because

Johnson had not raised this claim on direct appeal, the claim was not preserved for

post-conviction review and was waived.  (Doc. 33-2 at 96-97.)  The Superior Court

noted that Johnson did not argue that his counsel was ineffective for failing to raise

this claim.  (*Id.* at 97 n.5.)

### 3.    Procedural Default

Respondents first argue that Johnson's *Brady* claim is procedurally defaulted

because the Superior Court found it to be procedurally barred under state rules.

The Court agrees and will deny Johnson's *Brady* claim for this reason.        **a.**

### Legal standard

"The procedural default doctrine precludes a federal habeas court from

'reviewing a question of federal law decided by a state court if the decision of that

court rests on a state law ground that is *independent* of the federal question and

*adequate* to support the judgment.'" *Bronshtein v. Horn*, 404 F.3d 700, 707 (3d

Cir. 2005) *cert. denied*, 546 U.S. 1208 (2006) (quoting *Coleman v. Thompson*, 501

U.S. 722, 729 (1991)). The requirements of "independence" and "adequacy" are

distinct. *Leyva*, 504 F.3d at 365-66.

A state procedural ground is not "independent", and thus will not bar federal

habeas relief, "if the state law ground is so 'interwoven with federal law' that it

cannot be said to be independent of the merits of a petitioner's federal claims."

*Johnson v. Pinchak*, 392 F.3d 551, 557 (3d Cir. 2004) (quoting *Coleman*, 501 U.S.

at 740). In determining whether a state court ground is independent, a habeas court

first determines whether the decision of the last state court to which the petitioner

presented his federal claim "fairly appears to rest primarily on federal law, or to be

interwoven with the federal law." *Id.* If so, only then does the court determine if

the decision of last state court rendering judgment on the claim "clearly and

expressly states that its judgment rests on a state procedural bar" rather than the

merits of the claim. *Id.*

"The United States Supreme Court has employed a variety of tests to

determine whether a state ground is 'adequate.'" *Bronshtein*, 404 F.3d at 707.

Generally, "[a] state rule is 'adequate' for procedural default purposes if it was

firmly established, readily ascertainable, and regularly followed at the time of the

purported default." *Leyva*, 504 F.3d at 366.  Conversely, "state procedural rules have been held to be inadequate if they are not firmly established and regularly followed or if they are novel and unforeseeable." *Bronshtein*, 404 F.3d at 707 (citations omitted).  In assessing adequacy, a court considers whether:  "(1) the state procedural rule speaks in unmistakable terms; (2) all state appellate courts refused to review the petitioner's claims on the merits; and (3) the state courts' refusal in this instance is consistent with other decisions." *Leyva*, 504 F.3d at 366 n.10 (quoting *Jacobs v. Horn*, 395 F.3d 92, 117 (3d Cir. 2005)).  The adequacy test serves two purposes.  "First, the test ensures that federal review is not barred unless a habeas petitioner had fair notice of the need to follow the state procedural rule." *Bronshtein*, 404 F.3d at 707.  Second, the test prevents discrimination by ensuring that habeas review is foreclosed only "by what may honestly be called 'rules' – directions of general applicability – rather than by whim or prejudice against a claim or claimant." *Id.* at 707-08.

### b.    Independence and adequacy

In this case, the Superior Court did not base its decision regarding Johnson's *Brady* claim on federal law, but clearly and expressly denied his claim based on Pennsylvania procedural rules.  The rule was thus "independent" of the federal question raised by Johnson's claim.

The procedural rule upon which the Superior Court based its decision was also "adequate."  The only state appellate court to address Johnson's *Brady* claim refused to review the claim on the merits.  The Superior Court denied Johnson's due process claim after finding it had been waived because the claim was not raised on direct appeal.  The terms of this state procedural rule are firmly established by statute and are unmistakable.  Under 42 Pa. C.S.A. § 9543(a)(3), to be eligible for PCRA relief, "the petitioner must plead and prove by a preponderance of the evidence ... [t]hat the allegation of error has not been ... waived."  Under 42 Pa. C.S.A. § 9544(b), "an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding."  This waiver rule has been regularly and consistently applied by Pennsylvania courts in non-capital cases. *See, e.g.*, *Commonwealth v. Natividad*, 938 A.2d 310, 331 n.15 (Pa. 2007); *Commonwealth v. Carson*, 913 A.2d 220, 263 (Pa. 2006); *Commonwealth v. Abdul-Salaam*, 808 A.2d 558, 583-84 (Pa. 2001); *Commonwealth v. Pursell*, 724 A.2d 293, 306 (Pa. 1999); *see also* 2 West Pa. Prac., Crim. Pro. § 17.2 (2d ed. 2007) (collecting Pennsylvania precedent).  The Third Circuit and numerous federal district courts in Pennsylvania have therefore found the rule to provide an adequate state-law ground precluding habeas review.  *See, e.g.*, *Peterson v.*

*Brennan*, 196 Fed. Appx. 135, 142 (3d Cir. 2006); *Sistrunk v. Vaughn*, 96 F.3d 666, 674 (3d Cir. 1996); *Edwards v. Rozum*, C.A. No. 07-1736, 2008 WL 351905, at *10 (E.D. Pa. Feb. 7, 2008); *Rivera v. Tennis*, C.A. No. 06-142, 2007 WL 1965430, at *4 (W.D. Pa. July 3, 2007); *McMullen v. Tennis*, C.A. No. 06-183, 2006 WL 3437314, at *6 (M.D. Pa. Nov. 29, 2006).  The Court likewise finds the Superior Court's decision in this case was based on an adequate state rule.

Johnson argues that the alleged *Brady* violation itself makes § 9544(b) inadequate because the prosecution's purported suppression at trial made it impossible for him to raise the issue on direct appeal under Pennsylvania Rule of Appellate Procedure 302(a) which states that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal."  This argument is unpersuasive.  "First, although ordinarily '[i]ssues not raised before the lower court are waived and cannot be raised for the first time on appeal,' Pa. R.A.P. 302(a), a claim will not be considered waived if it could not have been raised in the lower tribunal."  *Commonwealth v. Mouzon*, 812 A.2d 617, 624 n.10 (Pa. 2002); *see also* Pa. R. Crim. P. 702(C) & miscellaneous comment (requiring that any claim of after-discovered evidence must be raised promptly after its discovery and noting that "after-discovered evidence discovered during the direct appeal process must be raised promptly during the direct appeal process").  Thus, as the Superior Court

66

found, Johnson "could have" raised his claim on appeal "but failed to do so." *See* 42 Pa. C.S.A. § 9544(b).

Moreover, Johnson's argument conflates two separate inquiries. The merits of Johnson's *Brady* claim do not determine whether the claim is procedurally defaulted. *See, e.g.*, *Tillery v. Horn*, 142 Fed. Appx. 66, 68 (3d Cir. 2005) (refusing to consider petitioner's argument that the Superior Court incorrectly determined claim was waived because such an argument "conflat[es] concepts of the adequacy and independence of a state procedural rule with the correctness of the state court's application of its own law"). On habeas review, this Court must determine whether the procedural rule applied by the state court is independent and adequate , but is not at liberty to second-guess the state court's application of its own independent and adequate rule. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law."); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (same); *Taylor v. Horn*, 504 F.3d 416, 448 (3d Cir. 2007) ("It is well established that a state court's misapplication of its own law does not generally raise a constitutional claim. The federal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."). The Superior Court found that Johnson had waived his claim under

an independent and adequate procedural rule, and therefore, Johnson's *Brady* claim

is procedurally defaulted.

### c.    Cause and prejudice

Johnson's procedural default does not end our inquiry, however.  Procedural

default does not bar federal habeas review if a petitioner "can demonstrate cause

for the default and actual prejudice as a result of the alleged violation of federal

law, or demonstrate that failure to consider the claims will result in a fundamental

miscarriage of justice."  *Coleman*, 501 U.S. at 750.[18]  To establish cause for a

procedural default, a petitioner must "show that some objective factor external to

the defense impeded counsel's efforts to comply with the State's procedural rule."

*Murray v. Carrier*, 477 U.S. 478, 488 (1986).  For example, the petitioner may

show "that the factual or legal basis for a claim was not reasonably available to

counsel or that some interference by officials made compliance impracticable."  *Id.*

(citations omitted).  To demonstrate actual prejudice, the petitioner must show "not

merely that the errors at trial created a possibility of prejudice, but that they

---

[18] Johnson does not argue that there was a "fundamental miscarriage of justice," which generally requires a petitioner to establish "actual innocence" by proving "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Slutzker v. Johnson*, 393 F.3d 373, 381 n.7 (3d Cir. 2004) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Because sufficient evidence was presented for a reasonable jury to convict Johnson, it is highly unlikely that he could meet this stringent standard.  *See id.*  In any event, the "cause and prejudice" ground for excusing procedural default must be addressed before examining "actual innocence." *Id.* (citing *Dretke v. Haley*, 541 U.S. 386, 393-94 (2004)).

worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

In this case, as in most such cases, the cause and prejudice inquiry parallels the merits of the alleged *Brady* violation itself. *See, e.g.*, *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S. 263, 282 (1999); *Slutzker v. Johnson*, 393 F.3d 373, 385-86 (3d Cir. 2004). In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Strickler*, 527 U.S. at 281 (quoting *Brady*, 373 U.S. at 87). There are three components of a *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued, in that the evidence was material to the case. *Id.* at 281-82. Here, the first element is fulfilled because it is beyond cavil that the evidence at issue, Doubs' plea agreement, could have been used by Johnson to

impeach Doubs.[19]   (*See* Doc. 66-25 at 16, 19.)   The existence of the second and third elements will also answer the cause and prejudice question.   Suppression of the plea agreement would constitute cause for Johnson's failure to assert his *Brady* claim on direct appeal, and unless this evidence is material for *Brady* purposes, its suppression did not give rise to sufficient prejudice to overcome his procedural default.   *See Banks*, 540 U.S. at 691; *Strickler*, 527 U.S. at 282.   For the reasons that follow, the Court finds that the prosecution did suppress the plea agreement and thus that Johnson had cause for failing to raise his claim on direct appeal. However, the Court also finds that Johnson has failed to demonstrate that the plea agreement was material for *Brady* purposes and thus has failed to establish the prejudice required to excuse his procedural default.

### i.   Cause / Suppression

The suppression issues turns on whether the plea agreement with Doubs in her unrelated case was within the materials that the Pennsylvania Attorney General had a duty to disclose to Johnson in his case.   Although it is a close question, the Court finds that Johnson's prosecutor had a duty to disclose the plea agreement.

---

[19] The Respondents argue that because Doubs' plea agreement involved no quid pro quo for her testimony that it is not favorable evidence for *Brady* purposes.   The plea agreement, however, was at least colorably relevant to impeaching Doubs' credibility.   The impeaching effect of this evidence is certainly lessened by the fact that the plea agreement had nothing to do with Doubs' testimony, but this argument goes to *how* favorable the evidence is rather than *whether* it is favorable at all, and is better addressed as part of the materiality inquiry.

As an initial matter, several facts are clearly established from the record in this case, including the Court of Common Pleas' opinion on Johnson's first PCRA petition, the testimony of Doubs and Johnson's prosecutor, and the transcripts of Johnson's and Doubs' proceedings: (1) Doubs negotiated her plea agreement solely with the county prosecutor; (2) the plea agreement was the result of weaknesses in the charges against Doubs and was unrelated to her testimony at Johnson's trial; (3) there was no negotiation or deal of any kind between Johnson's prosecutor and Doubs regarding her testimony[20]; and (4) Johnson's prosecutor was unaware of the Doubs' plea agreement at the time of trial.  These facts, however, do not remove the plea agreement from the category of materials that Johnson's prosecutor had a duty to disclose.

"There is no question that the government's duty to disclose under *Brady* reaches beyond evidence in the prosecutor's actual possession."  *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006).  Prosecutors have "a duty to learn of any favorable evidence known to others acting on the government's behalf in the case."

---

[20] Johnson repeatedly refers to an "implicit understanding" that Doubs would be rewarded for her testimony.  This is pure speculation on Johnson's part.  The record is entirely devoid of any support for this suggestion despite the fact that Court allowed Johnson to conduct a searching inquiry of the files of the Pennsylvania Attorney General, the Dauphin County District Attorney, and the Harrisburg Bureau of Police aimed at uncovering evidence of such an agreement.  The record in this case, and the lack of the "smoking gun" which Johnson hoped to find through discovery, clearly demonstrate that there was no agreement – explicit, implicit, or otherwise – between Doubs and any prosecutor to reward Doubs in any way for her testimony.

*Id.* (citing *United States v. Giglio*, 405 U.S. 150, 154 (1972) and quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). Prosecutors are thus charged with "constructive knowledge" of *Brady* material, that is material of which the prosecutor knew or should have known even though developed in another case. *Id.* (citing *United States v. Joseph*, 996 F.2d 36, 39 (3d Cir. 1993)). The Third Circuit has discussed the scope and bounds of such constructive knowledge in several relevant cases.

In *United States v. Perdomo*, 929 F.3d 967 (3d Cir. 1991), the court found a *Brady* violation where the prosecutor failed to disclose the criminal background of prosecution witnesses. The prosecutor in that case checked the National Crime Information Center database for criminal records, but failed to check local Virgin Island records. The court found that the prosecutor's failure to uncover and disclose information contained in the local records violated *Brady* because the information was "readily available" to the prosecutor. *Id.* at 970. The court explained that "the availability of information is not measured in terms of whether the information is easy or difficult to obtain but by whether the information is in the possession of some arm of the state." *Id.* at 971.

In *Joseph*, the defendants argued that the prosecutor violated due process by failing to disclose exculpatory information that was in the file of an unrelated case

he was also prosecuting.  The court rejected this argument, holding that "where a prosecutor has no actual knowledge or cause to know of the existence of *Brady* material in a file unrelated to the case under prosecution, a defendant, in order to trigger an examination of such unrelated files, must make a specific request for that information – specific in the sense that it explicitly identifies the desired material and is objectively limited in scope."  *Joseph*, 996 F.2d at 41.  The court found that the defendants had made only a general request for *Brady* materials and therefore "it would have been unreasonable to expect the prosecutor to search all the unrelated files in his office to look for exculpatory material."  *Id.* at 40.

In *United States v. Thornton*, 1 F.3d 149 (3d Cir. 1993), the court held that two letters from the DEA detailing payments to two government witnesses fell within the *Brady* disclosure rule despite the fact the federal prosecutors were unaware of the payments.  The court stated that "prosecutors have an obligation to make a thorough inquiry of all enforcement agencies that have a potential connection with their witnesses."  *Id.* at 158.  While they had requested DEA agents to advise them of any such payments, the prosecutors did not follow up after the DEA failed to respond, and therefore did not fulfill their *Brady* disclosure obligations.  *Id.*

In *United States v. Pelullo*, 399 F.3d 197 (3d Cir. 2005), the court held that

the government did not violate *Brady* by failing to disclose documents found

within 160 boxes and 36 file cabinets of documents collected by the defendant over

twenty years.  The court focused on (1) the respective knowledge of the parties; (2)

the defendant's access to the documents; and (3) the government's representations.

*Id.* at 211.  The court noted that the government was unaware of the exculpatory

nature of the documents whereas the defendant possessed such knowledge because

he had generated the documents.  *Id.* at 211-12.  Further, the government made the

documents available to the defendant and his attorneys for copying and inspection.

 *Id.* at 212.  The court stated that "[o]ur jurisprudence has made clear that *Brady*

does not compel the government to furnish a defendant with information which he

already has or, with any reasonable diligence, he can obtain himself."  *Id.* at 213

(quoting *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir.1984)).  The court

noted that "[i]t is equally clear, however, that defense counsel's knowledge of, and

access to, evidence may be effectively nullified when a prosecutor misleads the

defense into believing the evidence will not be favorable to the defendant."  *Id.*

But the court found no such reliance, and in any event, held that the defendant's

access to his own documents precluded a finding of a *Brady* violation since

"defense knowledge of, or access to, purportedly exculpatory material is

74

potentially fatal to a *Brady* claim, even where there might be some showing of governmental impropriety." *Id.* at 213-15.

Also at issue in *Pelullo* was whether the prosecutors should be charged with constructive knowledge of documents in the possession of the Pension and Welfare Benefits Administration ("PWBA"), a part of the Department of Labor.  The court acknowledged that "*Brady* places an affirmative obligation on prosecutors 'to learn of any favorable evidence known to the others acting on the government's behalf in the case,'" *id.* at 216 (quoting *Kyles*, 514 U.S. at 437), but stated that *Brady* does not "impos[e] a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue," *id.* (quoting *United States v. Merlino*, 349 F.3d 144, 154 (3d Cir. 2003)).  "Applying the general principle ... that the prosecution is only obligated to disclose information known to others acting on the government's behalf in a particular case," the court concluded that there was no "constructive knowledge" because there was no reason to believe that the PWBA was acting on behalf of the prosecution, no indication that the PWBA and the prosecution were engaged in a joint investigation or that they otherwise shared labor and resources, and no indication that the prosecution had any sort of control over the PWBA officials.  *Id.*

Finally, at issue in *Risha* was whether federal prosecutors had a duty to disclose that, unbeknownst to them, their key witness expected consideration for testifying against the defendant and that his testimony in fact helped him to secure a favorable plea agreement in unrelated state charges pending against him.  The court noted that in addressing the issue of cross-jurisdiction constructive knowledge, courts should look to:  (1) whether the party with knowledge of the information is acting on the government's behalf or is under its control; (2) the extent to which the two jurisdictions are part of a team, are participating in a joint investigation, or are sharing resources; and (3) whether the entity charged with constructive possession has ready access to the evidence.  *Risha*, 445 F.3d at 304.  The Third Circuit remanded the case so that the district court could make these factual determinations.

Allegations of a "constructive" *Brady* violation present a difficult task for the court, *Joseph*, 996 F.2d at 39, and like the court in *Pelullo*, we find ourselves at the intersection of several considerations identified in *Brady* jurisprudence, *Pelullo*, 399 F.3d at 213.  Respondents correctly point out that with some reasonable diligence, Johnson could have obtained the information regarding Doubs' plea agreement.  *See id.*  Doubs pled guilty to the robbery charges on February 7, 1997 and was sentenced on March 26, 1997.  Johnson filed his direct

76

appeal on April 30, 1998, more than a year later.  Johnson's trial counsel, who was

also his counsel on appeal, was well aware of the charges pending against Doubs

and had more than sufficient time to examine the public records of Doubs' plea and

sentencing before Johnson's direct appeal.  In fact, at the hearing on Johnson's first

PCRA petition, his counsel testified that she "remember[ed] checking the docket

sheet to find out what had happened with [Doubs'] case afterwards and realizing

that she got a pretty good sentence on her charges."  (Doc. 66-25 at 18.)  Johnson

thus had at least some knowledge of and access to the purported *Brady* materials,

and "defense knowledge of, or access to, purportedly exculpatory material is

potentially fatal to a *Brady* claim, even where there might be some showing of

governmental impropriety."[21]  *Pelullo*, 399 F.3d at 215.

Also militating against imputing constructive knowledge of the plea

agreement to Johnson's prosecutor is the lack of control over the county prosecutor

by the Pennsylvania Attorney General.  *See Risha*, 445 F.3d at 304; *Pelullo*, 399

F.3d at 218.  There is no indication that Johnson's prosecutor was involved in any

way with the negotiation of Doubs' plea agreement.  The county prosecutor

---

[21] These facts also buttress the Superior Court's determination that Johnson waived his
*Brady* claim before the state courts.  Because he had knowledge of and access to the information
that forms the basis for his *Brady* claim well before his direct appeal, Johnson "could have"
raised the claim on appeal "but failed to do so" under 42 Pa. C.S.A. § 9544(b).

independently agreed to the deal with Doubs solely because of weaknesses in the case against her, not at the behest of the Attorney General's Office or for any reason related to Johnson's prosecution.

Several other factors, however, outweigh these considerations and tip the balance in favor of charging Johnson's prosecutor with constructive knowledge of the Doubs plea agreement. First, the plea agreement was readily available to the prosecution. *See Risha*, 445 F.3d at 304, *Perdomo*, 929 F.3d at 970-71. Johnson's prosecutor was certainly aware of the charges pending against Doubs and had access to and contact with his witness prior to trial. Although he did not have actual knowledge of the plea agreement, Johnson's prosecutor had ready access to such information. Second, although it is clear that the Attorney General did not control Doubs' prosecution, there is some indication of coordination between the two prosecutors. Johnson's case was handled, at least initially, by the Dauphin County District Attorney, and in fact, the same attorney that entered into the plea agreement with Doubs represented the government at Johnson's preliminary hearing. (*See* Doc. 66-25 at 22; Doc. 66-27 at 18.) Doubs' prosecutor continued to follow Johnson's case, and should have been aware of the potential impact of Doubs' plea agreement on Johnson's prosecution. (*See id.* at 20-21.) Thus, unlike other cases involving a lack of coordination between government agencies, in this

78

case, the two prosecutors were both involved, to some degree, in Johnson's

prosecution, and their authority overlapped to some extent.  *See Pelullo*, 399 F.3d

at 216-17 & n.21; *see also Strickler*, 527 U.S. at 275 n.12.

Most importantly, Johnson was entitled to rely on the government's

representations that it had disclosed all *Brady* material.  *See Banks*,  540 U.S. at

692-94; *Strickler*, 527 U.S. at 284-85; *Pelullo*, 399 F.3d at 213.  Johnson's trial

counsel inquired of the prosecution whether Doubs had been offered any plea

negotiation (Doc. 66-25 at 18-19), thus triggering the prosecution's duty to search

even an unrelated file for such information.  *See Joseph*, 996 F.2d at 41.  The

prosecutor represented that no negotiations had taken place with Doubs and no plea

agreement had been offered to her.  (Doc. 66-25 at 18-19.)  Further, Johnson's

prosecutor maintained an open file policy, implicitly representing that all *Brady*

materials would be included in the open file.[22]  *Strickler*, 527 U.S. at 283-84.  The

reasonable access that Johnson's counsel may have had to information about

Doubs' plea is nullified by her reasonable reliance on the government's

---

[22] The Respondents argue that the prosecutor's open file policy weighs against a finding
of suppression, but the Supreme Court has made clear that "if a prosecutor asserts that he
complies with *Brady* through an open file policy, defense counsel may reasonably rely on that
file to contain all materials the State is constitutionally obligated to disclose under *Brady*."
*Strickler*, 527 U.S. at 283 n.23; *see also Banks*, 540 U.S. at 693 (noting *Strickler* holds that "an
open file policy is one factor that explains why trial counsel did not advance a *Brady* claim").

representations that it had met its *Brady* obligation.[23]  *See Pelullo*, 399 F.3d at 213;

*see also Banks*, 540 U.S. at 695-96; *Strickler*, 527 U.S. at 284-85.  This is so even

though Johnson's counsel may have learned of the plea agreement in time to raise

it on direct appeal.  *See Strickler*, 527 U.S. at 284 ("If it was reasonable for trial

counsel to rely on, not just the presumption that the prosecutor would fully perform

his duty to disclose all exculpatory materials, but also the implicit representation

that such materials would be included in the open files tendered to defense counsel

for their examination, we think such reliance by counsel appointed to represent

petitioner in state habeas proceedings was equally reasonable.  Indeed, in *Murray*,

[477 U.S. at 491] we expressly noted that "the standard for cause should not vary

depending on the timing of a procedural default.").  Finally, Doubs' testimony at

trial – that *Johnson's* prosecutor had made no agreement with her regarding her

---

[23] The Supreme Court has explicitly left unaddressed "the impact of a showing by the State that the defendant was aware of the existence of the documents in question and knew, or could reasonably discovered, how to obtain them," *Strickler*, 527 U.S. 288 n.33, but the Third Circuit has held that "defense counsel's knowledge of, and access to, evidence may be effectively nullified when a prosecutor misleads the defense into believing the evidence will not be favorable to the defendant,"*Pelullo*, 399 F.3d at 213.  While we do not characterize the government's actions here to be "misleading," the prosecution's representations vitiate the impact of any access Johnson's counsel may have had to the plea agreement.  Further, the government has not demonstrated that Johnson's counsel had actual knowledge of the plea agreement, but merely that she had reasonable access to such information.  If the effect of access plus knowledge may be nullified by the government's representations of compliance with its *Brady* obligation, then the effect of access alone is certainly outweighed by the government's representations in this case.

pending charges – while literally true, was not expanded upon by the prosecution to explain that *Doubs'* prosecutor had in fact offered her a plea agreement, and thus served to confirm Johnson's reliance on the government's representations.  *See Banks*, 540 U.S. at 693-94; *Strickler*, 527 U.S. at 287.

In sum, the Court finds that Johnson had sufficient cause for failing to raise his *Brady* claim in accordance with state procedural rules for reasons quite analogous to those identified by the Supreme Court in *Banks* and *Strickler*:  The prosecution withheld favorable evidence; Johnson reasonably relied on the government's open file policy and other representations that it had fulfilled its duty to disclose such evidence; and this reliance was confirmed by Doubs' trial testimony.  *See Banks*, 540 U.S. at 693; *Strickler*, 527 U.S. at 289.

### ii.      Prejudice / Materiality

While Johnson has shown that the suppression of Doubs' plea agreement provided cause for his failure to comply with Pennsylvania procedures, he has not demonstrated that the plea agreement was material so as to excuse his procedural default.  "Unless suppressed evidence is material for *Brady* purposes, its suppression does not give rise to sufficient prejudice to overcome a procedural default."  *Banks*, 540 U.S. at 698 (quoting *Strickler*, 527 U.S. at 282).

The touchstone on materiality is *Kyles v. Whitley*, 514 U.S. 419 (1995). *Id.*

In *Kyles*, the Supreme Court stated that "a showing of materiality does not require

demonstration by a preponderance that disclosure of the suppressed evidence

would have resulted ultimately in the defendant's acquittal (whether based on the

presence of reasonable doubt or acceptance of an explanation for the crime that

does not inculpate the defendant)." 514 U.S. at 434 (citing *United States v. Bagley*,

473 U.S. 667, 680, 682, 685 (1985)). Rather, the petitioner must show "a

reasonable probability of a different result." *Id.* The Court explained that "the

adjective is important":

> The question is not whether the defendant would more
> likely than not have received a different verdict with the
> evidence, but whether in its absence he received a fair trial,
> understood as a trial resulting in a verdict worthy of
> confidence. A "reasonable probability" of a different result
> is accordingly shown when the government's evidentiary
> suppression "undermines confidence in the outcome of the
> trial."

*Id.* (quoting *Bagley*, 473 U.S. at 678). "The materiality inquiry is not just a matter

of determining whether, after discounting the inculpatory evidence in light of the

undisclosed evidence, the remaining evidence is sufficient to support the jury's

conclusions. Rather, the question is whether 'the favorable evidence could

reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict.'"  *Strickler*, 527 U.S. at 290 (quoting *Kyles*, 514 U.S. at 434-35).

In this case, the Court cannot find that a different verdict would have been reasonably probable if the Doubs plea agreement had been presented to the jury. While Johnson could have used the plea agreement as impeachment evidence on cross-examination of Doubs, this evidence would not have been effective at impeaching her credibility.  Doubs pled guilty to unrelated charges in an unrelated case.  The plea agreement was negotiated with a different prosecutor from a different government agency, and most importantly, and had nothing to do with her testimony at Johnson's trial.  Had the plea agreement been disclosed, Johnson's trial counsel would have been able to ask Doubs whether she received the plea agreement in exchange for her testimony.[24]  The answer, however, would have been a resounding "no", and the jury would have had before it precisely the same testimony as was actually presented at trial: Doubs was not offered any deal in exchange for her testimony.

---

[24] In fact, Johnson's counsel may not have ever asked this question.  Had Johnson's prosecutor known of the plea agreement at the time of trial, he likely would have asked Doubs on direct examination to confirm that she received nothing in exchange for her testimony, as he did with several other prosecution witnesses (*See, e.g.*, N.T. 116, 183), thereby undermining the effect of any such line of questioning from defense counsel.

Further, any attempt to impeach Doubs through questions about the plea agreement would have been largely cumulative. Doubs testified while wearing a prison uniform and stated that she came to court from Dauphin County Prison. She admitted to a prior conviction for forgery and that she was currently incarcerated on a robbery conviction. Doubs also admitted that she dealt and used illegal drugs. She stated that on the day of the murder, she woke up in a house with Walker and Johnson around 11:00 a.m. and followed her "usual routine" of buying some marijuana, smoking a "blunt," and "talking trash" in front of the Kentucky Fried Chicken. Finally, Doubs admitted that she initially lied to police during their investigation of the incident in exchange for someone paying her bail. Doubs' credibility had already been severely impeached, and the inclusion of evidence regarding her plea agreement would have added little to this cause.

Finally, even if Doubs' testimony had been further discredited, the jury might still have reached the same verdict. Although, as the county prosecutor indicated at her sentencing, Doubs's testimony was "very relevant," Doubs was not the prosecution's key witness. Doubs did not witness or testify about the killing or any of the events leading directly thereto. Her testimony focused almost exclusively on the actions of the defendants more than twelve hours prior to the murder. While this testimony provided a motive for the defendants' actions, as

Johnson notes, motive alone in insufficient to support a murder conviction.  The only testimony that Doubs gave regarding the murder itself – that Carla Brown was involved in the killing – actually served to undercut the testimony of Brown, the prosecution's most important witness.  A lack of additional evidence impeaching Doubs' credibility thus, in fact, benefitted Johnson to the extent that the jury was more likely to believe the portion of her testimony which impeached the prosecution's crucial witness.

In summary, the Court finds that the limited and cumulative effect of evidence regarding Doubs' plea agreement does not "put the whole case in such a different light as to undermine confidence in the verdict."  While the prosecution had a duty to disclose the plea agreement to Johnson, its failure to meet this obligation had little to no effect on the outcome of the trial.  Johnson has failed to demonstrate that the suppression of the plea agreement was material for *Brady* purposes and thus failed to show the actual prejudice required to excuse the procedural default of his *Brady* claim.  Johnson's second habeas claim will therefore be dismissed with prejudice.  *See Lines v. Larkins*, 208 F.3d 153, 155 (3d Cir. 2000).

**C.    Ineffective Assistance Claim**

Johnson's final habeas claim is that his trial counsel was ineffective for failing to object to the trial court's jury instructions and request other instructions regarding Carla Brown's drug use and prior inconsistent statements.  The Respondents counter that the trial court's instructions on witness credibility adequately addressed Brown's credibility and that Johnson's counsel was therefore not ineffective for failing to object or request other instructions.  The Court agrees with the Respondents that the Court of Common Pleas' jury instructions sufficiently instructed the jury on evaluating Brown's credibility and that Johnson's counsel was not ineffective for failing to object to these instructions or request other instructions.

## 1.    Background

Johnson notes that Brown's testimony established that at first, she intentionally lied to the police about the killing and that she was a drug user who was high on cocaine on the night of the incident.  Johnson argues that his trial counsel, therefore, should have requested Pennsylvania Suggested Standard Criminal Jury Instructions ("PSSCJI") regarding a witness's inconsistent statements and drug use.[25]

---

[25] Johnson also argues that his trial counsel was ineffective for failing to request a jury instruction regarding Brown's role a potential accomplice, but concedes that this claim was not raised before the state courts and accordingly is unexhausted and defaulted.  Johnson does not

86

Specifically, Johnson argues that his counsel should have requested PSSCJI

4.08A regarding inconsistent statements, which provides:

> 1.   You have heard evidence that a witness, [name of witness], made a statement on an earlier occasion that was inconsistent with [his] [her] present testimony.

> [First Alternative]

> 2.  You may, if you choose, regard this evidence as proof of the truth of anything that the witness said in the earlier statement.  You may also consider this evidence to help you judge the credibility and weight of the testimony given by the witness at this trial.

> [Second Alternative]

> 2.  You may consider this evidence for one purpose only, to help you judge the credibility and weight of the testimony given by the witness at this trial.   You may not regard evidence of an earlier inconsistent statement as proof of the truth of anything said in that statement.

> [3. When you judge the credibility and weight of testimony, you are deciding whether you believe the testimony and how important you think it is.]

Pa. Suggested Standard Crim. Jury Instructions, 4.08A (2005).

Johnson also argues that, in light of Brown's drug use, his counsel should

have request PSSCJI 4.17, which provides in relevant part:

---

attempt to argue cause and prejudice for this default and explicitly does not raise this claim as a ground for relief, but merely as "evidence that counsel clearly was not paying particularly close attention to the critical issue of jury instructions."  (Doc. 33 at 38-39 & n.5.)

1. As judges of the facts, you are sole judges of the credibility of the witnesses and their testimony. This means you must judge the truthfulness and accuracy of each witness's testimony and decide whether to believe all or part or none of that testimony. The following are some of the factors that you may and should consider when judging credibility and deciding whether or not to believe testimony:

a. Was the witness able to see, hear, or know the things about which [he] [she] testified?

b. How well could the witness remember and describe the things about which [he] [she] testified?

[c. Was the ability of the witness to see, hear, know, remember, or describe those things affected by youth, old age, or by any physical, mental, or intellectual deficiency?]

f. How well does the testimony of the witness square with the other evidence in the case, including the testimony of other witnesses?  [Was it contradicted or supported by the other testimony and evidence?  Does it make sense?]

Pa. Suggested Standard Crim. Jury Instructions, 4.17(1)(a)-(c), (f) (2005).

During its jury instructions, the Court of Common Pleas provided the following instructions on witness credibility:

You as the judges or the finders of fact, the judges of fact, it's exclusively for you, your providence, to determine the facts in the case.  And you've been told this over and over again.  You determine the facts in the case by listening to the witnesses as they are presented to you on the stand. And in judging the credibility of a witness, you just use your good old-fashioned common sense.

But the law says there's some things you can look at.  This is by no means an exhaustive list.  It's just a list that they suggest, the law suggests, that you look at.  You can look at somebody's interest in the outcome of the case; are they related to parties in the case, any particular bias or prejudice that they may have toward one side or another.

*You can look at their ability to see things and what they described occurred*, were they in a position to see that.

*You may look at their ability to recall*, their mannerisms on the stand, all those things that you do every day in your own affairs.  When someone comes up to you and presents a particular position or tells you a particular fact, you factor that in your own mind from your every day common experience.  And that's what you do here.  And I'm not going to say any more about credibility.

But let me tell you, the law also says that in some ways in this case, you can fit the evidence together.  It meshes together.  *Some of the stories are similar and can be pieced together.  But in some of the testimony in this case, that can't be done.  And you, as the finder of fact, have to determine which side you're going to come down on.  Am I more convinced by this evidence or more convinced by evidence in contradiction to that?  You have to resolve that conflict in the evidence.*

*There's a principle that says that if someone intentionally takes the stand and lies about a particular fact, you're free to disregard their entire testimony*.  That's if you find that someone intentionally lied when they took the stand.  It is not uncommon in cases, in almost any case, a criminal case or a civil case, that *you'll hear witnesses testify over a period of time and repeatedly and that there may be some variance in detail* or some minor fact that occurs that really is not significant to the case.  That's something for you to

consider.  But that doesn't mean they intentionally lied
about something.

*So you have to determine, if there are differences, are they
of such significance or such major import that it would
affect their credibility*, or did they intentionally lie about
that, or is that just some minor variance as it relates to the
passage of time and people's perception of what they see?
We all watch athletic events or any event, and we can see
instant replays.  And that helps, when you watch something
three or four times, in determining what took place and the
facts.

You don't have that in real life.  You have real people who
are on the streets, who see something, who at the time the
crime or whatever may occur may not even be significant
to them.  Then they're called in here sometime later and
expected to recall great detail. But that's something for you
to consider in judging the entire credibility of a witness.

One of the witnesses in this case, I believe it was agreed
upon that they had a prior record for a crime of forgery.
Forgery is a crime involving dishonestly.  It involve
uttering a false document.  The fact that someone has been
convicted of forgery, that doesn't mean they're
intentionally lying, but it's a factor for you to consider,
saying their background here demonstrated that they were
convicted of a crime that involves dishonesty.  It's a factor
for you to consider along with all the other factors.  So I
point that out to you.

It doesn't mean they're a bad person or not worthy of
belief.  It's just a factor for you to consider in terms of
judging credibility.

(Doc. 66-23 at 28-30 [emphasis added]).

### 2.    State-Court Decisions

Johnson presented his ineffective assistance claim in his first PCRA petition. The Court of Common Pleas rejected this claim, holding that the jury instruction was adequate, and therefore, counsel was not ineffective for failing to object.  The court noted that Pennsylvania courts are not bound by the suggested standard jury instructions, which are only guides.  (Doc. 33-2 at 78.)  The court determined that its instruction was "adequate, accurate and clear as to issues of both general credibility and consideration of the effect of a prior inconsistent statement," and therefore that the "charge, in combination with trial counsel's vigorous arguments on the issues of Brown's lack of credibility and prior inconsistent statement, made it unnecessary for counsel to object."  (*Id.* at 80.)

Johnson again pressed his claim on appeal to the Superior Court.  After reviewing the trial court's jury instruction, that court also rejected Johnson's ineffective assistance claim, relying on the reasoning of the Court of Common Pleas.  (Doc. 33-2 at 98.)

### 3.    Legal Standard

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 685-86

(1984).  A defendant alleging ineffective assistance must satisfy the familiar two-part test set forth in *Strickland*:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.  To show deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms."  *Id.* at 687-88.  "Judicial scrutiny of counsel's performance must be highly deferential ... [and] a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  To prove prejudice, the defendant must show that counsel's deficient performance "actually had an adverse effect on the defense."  *Id.* at 693.  "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."  *Id.*  Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### 4.    Analysis

The Pennsylvania courts' decisions rejecting Johnson's ineffective assistance claim are not contrary to, and do not involve an unreasonable application of, this clearly established Federal law.  The credibility instructions provided by the trial court accurately instructed the jury of its duties in evaluating Brown's testimony.  Those instructions adequately accounted for Brown's drug use by instructing the jury to consider a witness's ability to perceive the things she described and ability to recall.  The instructions properly considered Brown's prior inconsistent statements by informing the jury that they could disregard a witness's testimony completely if she lied on the witness stand and instructing the jury to consider contradictions between testimony as well as differences in a witness's own statements at different times in evaluating credibility.  Under Pennsylvania law, a trial court commits no error by failing to use the non-binding suggested instructions where, as here, the court gives a comprehensive and clear explanation of the factors the jury should consider when deciding witness credibility. *Commonwealth v. Ragan*, 743 A.2d 390, 398 (Pa. 1999).  As the Pennsylvania courts found, the trial court's instructions were adequate, accurate, and clear, and

therefore, Johnson's counsel had no grounds on which to object to them.   Further, the trial court's instructions encompassed the points contained in the suggested instructions relied on by Johnson, and therefore, his counsel had no grounds on which to request those instructions.

Johnson argues that the suggested standards provide "much stronger" jury instructions on credibility that his counsel should have requested, but whether counsel's performance could have been stronger is not the relevant question on an ineffective assistance claim.  The proper inquiry is whether counsel's performance fell below an objectively reasonable standard.  Johnson's counsel was not objectively unreasonable for failing to object to the adequate and accurate jury instructions provided by the trial court.  Johnson's ineffective assistance claim will therefore be denied.

## V.    CERTIFICATE OF APPEALABILITY

Under Federal Rule of Appellate Procedure 22(b), the petitioner in a habeas corpus proceeding cannot take an appeal unless a certificate of appealability ("COA") is issued pursuant to 28 U.S.C. § 2253(c).  Section 2253(c) provides that a COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

Where the district court addresses the merits of a petitioner's claim, to obtain

a COA, "a petitioner must show that reasonable jurists could debate whether (or,

for that matter, agree that) the petition should have been resolved in a different

manner or that the issues presented were adequate to deserve encouragement to

proceed further." *Miller-El*, 537 U.S. at 336 (quoting *Slack v. McDaniel*, 529 U.S.

473, 484 (2000)).  "A prisoner seeking a COA must prove something more than the

absence of frivolity or the existence of mere good faith on his or her part." *Id.* at

338 (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983).  However, "a COA does

not require a showing that the appeal will succeed" and a petitioner need not prove

"that some jurists would grant the petition for habeas corpus." *Id.* at 337, 338.

"Where a district court has rejected the constitutional claims on the merits, the

showing required to satisfy § 2253(c) is straightforward:  The petitioner must

demonstrate that reasonable jurists would find the district court's assessment of the

constitutional claims debatable or wrong." *Id.* at 338 (quoting *Slack*, 529 U.S. at

484).

"When the district court denies a habeas petition on procedural grounds

without reaching the prisoner's underlying constitutional claim, a COA should

issue when the prisoner shows, at least, that jurists of reason would find it

debatable whether the petition states a valid claim of the denial of a constitutional

right and that jurists of reason would find it debatable whether the district court

was correct in its procedural ruling." *Slack*, 529 U.S. at 484. This test has two

components – "one directed at the underlying constitutional claims and one

directed at the district court's procedural holding" – both of which must be met

before a COA will issue. *Id.* at 484-85.

Johnson's sufficiency of the evidence claim will be denied on the merits.

Although the somewhat unsettled state of the law regarding the "fair presentation"

issue addressed at length above may lead some reasonable jurists to debate the

Court's procedural ruling, the merits of Johnson's first habeas claim, when

analyzed under the requisite governing standard, do not present an outcome that

would be debatable among reasonable jurists. Accordingly no COA will be issued

as to this claim.

Johnson's *Brady* claim will be denied as procedurally defaulted, and

therefore, the question of whether to issue a COA must be determined under the

"more complicated" two-part test set forth in *Slack*, 529 U.S. at 484. The inquiry

in this case is somewhat further complicated by the fact that the Court's procedural

ruling necessarily addressed the underlying constitutional claim because the "cause

and prejudice" analysis meshed with merits of the *Brady* claim. Johnson's *Brady*

claim was clearly procedurally barred in the state courts, and the state procedural

rule relied on by the Pennsylvania courts has been consistently found to be an independent and adequate state-law ground.  The question of cause (*i.e.* suppression) is a close one, but is resolved in Johnson's favor.  The question of prejudice (*i.e.* materiality), however, is much less in doubt.  Therefore, Johnson's second habeas claim does not clear the "reasonably debatable" threshold of § 2253(c) and no COA will be issued as to this claim.

Finally, Johnson's ineffective assistance of counsel claim will be denied on the merits, and no reasonable jurist would find the Court's assessment of this claim debatable or wrong.  No COA will issue as to this claim.

## VI.   CONCLUSION

For the foregoing reasons, Johnson's petition for a writ of habeas corpus pursuant to § 2254 will be denied.  Johnson's claims based on the alleged insufficiency of the evidence and ineffective assistance of counsel are denied on their merits.  Johnson's *Brady* claim is dismissed with prejudice as procedurally defaulted.  No certificate of appealability will be issued as to any claim.  An appropriate order, in accordance with this memorandum, shall be entered.